UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 25, 2011
```

SYNCORA GUARANTEE INC., f/k/a XL
Capital Assurance Inc.,

      - against -

EMC MORTGAGE CORP.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

09 Civ. 3106 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

      This breach of contract lawsuit arises out of a securitization transaction ("Transaction"), involving 9,871 Home Equity Line of Credit ("HELOC") residential mortgage loans, which were purchased and used as collateral for the issuance of $666 million in publicly offered securities ("Notes"). (Mem. in Supp. Mot. to Am. 3). Defendant EMC Mortgage Corp. ("EMC") aggregated the HELOCs, sold the loan pool to the entity that issued the Notes, and contracted with Plaintiff Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc., ("Syncora") to provide a financial-guaranty insurance policy protecting the investors in the Note. (Id.) Syncora claims that EMC breached its representations regarding 85% of the loan pool. It now moves for partial summary judgment or, alternatively, a ruling in limine, that it was not required to comply with a repurchase protocol as the exclusive remedy for all such claims. The Court GRANTS the motion for partial summary judgment on the grounds that, in light of the broad rights and remedies for which Syncora contracted, any such remedial limitation would have to be expressly stated.

**I. Facts**

      The Transaction, which closed on March 6, 2007, involved the securitization of a pool of HELOCs. EMC, acting for its affiliate Bear Stearns, sponsored the securities in the Transaction, purchasing 9,871 HELOCs from their originator (mortgage lender GreenPoint Mortgage Funding,

Inc. ("GreenPoint"), and pooling them into mortgage-backed securities. (Compl. ¶ 30). These securities were then issued to investors through various classes of notes with an aggregate balance of over $666 million. (Id. ¶ 32). The principal and interest payments from the HELOCs were supposed to provide the cash flow to make the monthly principal and interest payments on the Notes. (Id. ¶ 36). Syncora insured the investors' returns on a class of these mortgage-backed securities.

The Transaction was accomplished through several separate agreements ("Operative Documents") governing the rights and obligations of the various parties. These agreements include the Insurance and Indemnity Agreement (Forlenza Decl. Ex. 1 ("I&I")), Mortgage Loan Purchase Agreement (Forlenza Decl. Ex. 2 ("MLPA")), Sale and Servicing Agreement (Forlenza Decl. Ex. 3 ("SSA")), and Indenture Agreement.

Pursuant to the I&I, Syncora issued a Financial Guaranty Insurance Policy ("Policy"), in which it agreed to insure certain payments of interest and principal for the most senior, or investment-grade, class of issued securities. This obligation to pay insured security holders for any shortfall in cash flow from the underlying loans was irrevocable and unconditional. (Mem in Supp. Mot. Summ. J. 18; Mem. in Opp. Mot. Summ. J. 1). EMC made a series of representations and warranties, contained in the I&I, upon which Syncora relied in evaluating the risk of insuring the Transaction. Among these representations and warranties were the transactional warranties, regarding EMC's operations and the Transaction as a whole, (I&I § 2.01(i), (l), (m)); and the loan-level warranties, which relate to the characteristic of the underlying loan pool and individual loans, (id. § 2.01(j), (n)) . The I&I's loan-level warranties largely "incorporate[] and restate[]" the guarantees in the other Operative Documents, particularly the MLPA, "for the benefit of [Syncora]." (Id. § 2.01(n)). They cover the attributes of the loan pool and individual loans, as well

as the practices used to originate, underwrite, and service the loans. (Mem. in Supp. Mot. Summ. J. 6-7).

In exchange for the high level of risk borne by Syncora, the I&I confers broad rights and remedies. Under the I&I,

> (a) **Upon the occurrence of an Event of Default** and **so long as no Note Insurer Default shall have occurred and shall have continued** beyond any period of cure applicable thereto, the Insurer may exercise any one or more of the rights and remedies set forth below:
> . . .
> (iv) **take whatever action at law or in equity** as may appear necessary or desirable in its judgment **to collect the amounts, if any, then due** under this Insurance Agreement or any other Operative Document **or to enforce performance** and observance of any obligation, agreement or covenant of EMC, the Issuer or the Depositor under this Insurance Agreement or any other Operative Documents.
> . . .
> (b) **Unless otherwise expressly provided**, **no remedy herein conferred or reserved is intended to be exclusive of any other available remedy**, but each remedy shall be **cumulative** and shall be in **addition** to other remedies given under this Insurance Agreement, the Indenture or existing at law or in equity.

(I&I § 5.02). An Event of Default with regard to an EMC representation exists only when "[a]ny representation or warranty made by EMC . . . hereunder or under the Operative Documents . . . shall prove to be untrue or incomplete in any material respect, unless remedied under the Operative Documents." (I&I 5.01(a)). In addition to the common law remedies available, the I&I provides for reimbursement, indemnification, and subrogation. (I&I §§ 3.03(b), (c), 3.04(a), 3.07). It also entitles Syncora to certain incremental rights as a third party beneficiary of the Operative Documents:

> Each of EMC, the Issuer, the Depositor, and the Servicer agrees that the Insurer shall have all rights provided to the Insurer in the Operative Documents and that the Insurer shall constitute a third-party beneficiary with respect to such rights in respect of the Operative Documents.

(I&I § 2.02(j)). Finally, the I&I makes EMC's obligations to Syncora under the agreement "absolute and unconditional and . . . [to be] performed strictly in accordance with this Insurance Agreement under all circumstances . . . irrespective of . . . any . . . defense . . . that EMC . . . may have at any time against [Syncora]." (I&I § 4.03(a)).

The MLPA between EMC (designated the "HELOC Seller") and another Bear Stearns entity (designated the "Purchaser") is also relevant. The MLPA is a sales agreement and serves the limited purpose of transferring a pool of HELOC loans from EMC to the Purchaser. Section 7 of the MLPA includes 71 representations and warranties by EMC regarding the underlying loan pool and individual loans, all of which are incorporated into the I&I. It further creates a repurchase protocol that is available to the Purchaser and certain third parties including the Note Insurer (in this case, Syncora):

> Upon discovery or receipt of notice by the HELOC Seller, the Purchaser, the Indenture Trustee or the Note Insurer of a breach of any representation or warranty of the HELOC Seller set forth in this Section 7 . . . the party discovering or receiving notice of such breach shall give prompt written notice to the others. In the case of any such breach of a representation or warranty set forth in this Section 7, . . . the HELOC Seller will either (i) cure such breach in all material respects, (ii) repurchase the affected HELOC at the applicable Purchase Price or (iii) if within two years of the Closing Date, substitute a qualifying Substitute HELOC in exchange for such HELOC . . . .

(MLPA § 7(sss)). Section 7 continues that the repurchase protocol is the "Purchaser's, the Indenture Trustee's and the Noteholder's sole and exclusive remedy under this Agreement or otherwise respecting a breach of representations or warranties hereunder with respect to the HELOCs." There is no such limitation, however, for the Note Insurer. It does, however, provide that "any cause of action against the HELOC seller or relating to or arising out of a breach by the HELOC Seller of any representations and warranties made in this Section 7 shall accrue as to any HELOC upon (i) [discovery or notice of such breach] and (ii) failure by the HELOC Seller to [cure, repurchase, or substitute]." (MLPA § 7(sss) ("Accrual Limitation")).

4

While Syncora is a signing party only to the I&I, it is a third party beneficiary to the MLPA "with respect to [the rights provided to the Insurer in the Operative Documents]." (I&I § 2.02(j)). The MLPA provides that "[t]o the extent that this Agreement confers upon or gives or grants to the Note Insurer any right, remedy or claim under or by reasons of this Agreement, the Note Insurer may enforce any such right, remedy or claim conferred, given or granted hereunder." (MLPA § 27).

The final Operative Documents relevant to the Transaction are the SSA and Indenture Agreement. Syncora is not a signing party to either but again is a third party beneficiary to both. Like the MLPA, the SSA contains a repurchase protocol made exclusive for various parties, but not including the Insurer:

> Enforcement of the obligation of the Sponsor to purchase (or substitute a Substitute HELOC) any HELOC or any property acquired with respect thereto (or pay the Repurchase Price as set forth in the above proviso) as to which a breach has occurred and is continuing shall constitute the sole remedy respecting such breach available to the Issuing Entity, the Noteholders or the Indenture Trustee on their behalf.

(SSA § 2.03(b)).

Syncora has attempted to exercise its third party beneficiary rights and use the repurchase protocol to address EMC's breaches of its loan warranties. Syncora alleges that after hiring consultants to investigate poor loan performance, it learned that more than 85% of a randomly selected pool of loans contained defects that breached the loan-level warranties. (Mem. in Supp. Summ. J. 11). Syncora notified EMC of these claimed breaches and demanded that it comply with its obligations to cure the breaches, repurchase, or substitute the breaching loans. EMC agreed to repurchase certain loans, but disputes the others either because Syncora misinterpreted the

representations relied upon or because the loans were not defective and had performed well before going into default.[1] (Mem. in Supp. Mot. Summ. J. 12).

## II. Procedural History

Syncora commenced this lawsuit on March 31, 2008, alleging five contract-based causes of action against EMC, including breach of representations and warranties with regard to the HELOCs. (Compl. ¶¶ 59-77).[2] Syncora bases its claim on a random sampling of 400 loans out of a 9,871 loan portfolio, and asks EMC to repurchase the HELOCs on a pool-wide basis, seeking to bypass the MLPA's loan-by-loan remedy. (Id. ¶¶ 55, 70). EMC contests this approach, arguing that Syncora is required to identify the breaches as to each loan, pursuant to the repurchase protocol, and that its claims should be limited to those loans for which it did so. On June 25, 2010, Syncora moved for partial summary judgment, arguing that it was not limited to the contractual loan-by-loan remedy, but rather could seek a pool-wide remedy based on sampling and extrapolation. Alternatively, it sought a ruling in limine that proof of its claims for breach of loan-level warranties would not be limited to those loans submitted to EMC under the repurchase protocol.

## III. Analysis

Summary judgment is proper if the record shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that

---

[1] Syncora has notified EMC of 1,300 mortgages and asked EMC to cure. EMC agreed with respect to 20.
[2] Syncora's causes of action primarily arise under the I&I. Only the second—to enforce EMC's obligations under the repurchase protocol—alleges a breach only of the MLPA and SSA. The other causes of action allege breaches of the I&I (and, for the first cause of action, of the MLPA as well) based on breaches of the warranties stated in the MLPA and incorporated into the I&I.

it is entitled to relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).

In interpreting a contract, the goal is "to give effect to the intention of the parties as expressed in the unequivocal language they have employed." Id. at 245. A contract is ambiguous if it is susceptible to more than one reasonable interpretation. See, e.g., 242-44 E. 77th St., LLC v. Greater N.Y. Mut. Ins. Co., 815 N.Y.S.2d 507, 511 (N.Y. App. Div. 1st Dep't 2006). Whether a contract is ambiguous is a question of law for the court. Cont'l Ins. Co. v. Atl. Cas. Ins. Co., 603 F.3d 169, 180 (2d Cir. 2010). "If the contract is unambiguous, its meaning is likewise a question of law for the court to decide," JA Apparel Corp., 568 F.3d at 397, objectively by looking to the language of the contract and giving the words and phrases their plain meaning. See Klos v. Lotnnicze, 133 F.3d 164, 168 (2d Cir. 1997); Brooke Grp. v. JCH Syndicate, 663 N.E.2d 635, 638 (N.Y. 1996); Cutter v. Peterson, 203 A.D.2d 812, 814 (App. Div. 3d Dep't 1994). When interpreting an unambiguous contract, "the court is to consider its '[p]articular words' not in isolation 'but in light of the obligation as a whole and the intention of the parties manifested thereby.'" JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009) (quoting Kass v. Kass, 91 N.Y.2d 554, 566 (1998)). A contract should not be interpreted so as to render a clause superfluous or meaningless. Galli v. Metz, 973 F.2d 145, 149 (2d Cir.1992). "[I]t is the general rule that written contracts executed simultaneously and for the same purpose must be read and interpreted together." Liberty USA Corp. v. Buyer's Choice Ins. Agency, 386 F. Supp. 2d 421, 425 (S.D.N.Y. 2005).

Syncora argues that, as a third party beneficiary, it bargained for the right to take advantage of the MLPA's repurchase protocol, but it is not its sole remedy for breach of loan-level

7

warranties. (Mem. in Supp. Mot. Summ. J. 3). It contends that MLPA § 7 provides the sole and exclusive remedy only for the Purchaser, Indenture Trustee, and Noteholders, not for the Note Insurer (Syncora). Given how broad its rights and remedies under the I&I are, Syncora argues, had the parties intended to limit them, they surely would have done so expressly.

EMC responds that Syncora's remedies under the I&I are subject to the limitations of the MLPA. Specifically, the "sole and exclusive" remedy for breaches of the loan-level warranties contained in the I&I is the MLPA's requirement that EMC cure, repurchase, or substitute loans breaching these warranties, as evidenced by the language of the accrual limitation. EMC argues that Syncora seeks a pool-wide remedy, excusing it from having to prove breaches of representations and warranties regarding each individual loan. This is inconsistent with the contract and the parties' course of dealing. (Mem. in Opp. Mot. Summ. J. 1). If EMC is correct, Syncora can only bring claims for the approximately 1,300 loans it submitted to EMC for repurchase.[3]

The Operative Documents grant especially broad rights and remedies to Syncora because, as the financial guarantor under an unconditional and irrevocable insurance policy, it bears the greatest loss if the loans underperform and the other parties break their contractual obligations. The I&I is the primary agreement governing the relationship between Syncora—as insurer of certain securities—and EMC—as their sponsor. The plain language of the I&I reflects the parties' clear intent to provide expansive and inclusive remedies in case of breach, clearly reserving Syncora's right to pursue any available remedy under the I&I, common law, or equity. (See I&I §

---

[3] EMC further argues that Syncora may not pursue any remedies because it is in default on its obligation to pay insurance claims. (Mem. in Opp. Mot. Summ. J. 3). Section 5.02 of the I&I makes the remedies in the I&I, MLPA, and SSA unavailable when there has been a Note Insurer Default, defined in part as "[t]he existence and continuance of . . . a failure by the Note Insurer to make a payment required under the Policy in accordance with its terms." (Callagy Decl. Ex. F ("Addendum to I&I") 118). EMC asserts that, based on an April 10, 2010 order from the New York Insurance Department indicating that Syncora has not paid insurance claims since April 2009, Syncora is precluded from bringing any claims at this time. (Callagy Decl. Ex. E; see also Ex. D (Syncora's financial statements)). EMC has not moved for summary judgment on this issue.

5.02(a), (b)). Syncora only alleges misrepresentations about the HELOCs, not EMC's operations or financial condition. Breaches of these loan-level, as opposed to transactional, warranties are covered by the MLPA and SSA, as incorporated in the I&I. (See Mem. in Opp. Mot. Summ. J. 10). The I&I only "incorporates and restates" these representations "for the benefit of the Insurer." (I&I § 2.02(j)). There is no indication that the parties intended to limit Syncora's rights or remedies in any way. Rather, the I&I plainly makes its remedies cumulative and gives it obligations precedence over any defenses provided by the other Operative Documents. (I&I §§ 4.03(a), 5.02(b)).

The MLPA is a sales contract, not an insurance agreement, but it does provide certain remedies to a generic "Note Insurer," which in this case is Syncora. Its language indicates that it is intended only to provide additional rights and remedies to Syncora. For example, the MLPA includes the Note Insurer among the parties for whom the repurchase protocol is available, yet excludes it from the list of parties for whom it is the sole and exclusive remedy. This omission is particularly significant in light of the I&I's qualification that "[u]nless otherwise **expressly** provided, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy, but each remedy shall be cumulative." (I&I § 5.02(b) (emphasis added)). The MLPA does not limit Syncora's rights and remedies under the I&I. In addition, MLPA § 27 permits Syncora to enforce any of the rights conferred under the MLPA, yet contains no limiting language on the means for enforcement. This interpretation is consistent with the I&I's incorporation of the MLPA's representation and warranties, only for Syncora's benefit; as well as Syncora's status as third party beneficiary to the MLPA only with respect to the rights conferred therein.

Before Syncora can exercise any of its rights under the I&I, (1) there must be an Event of Default; (2) there must not be a "Note Insurer Default"; and (3) there must not be a different

remedy expressly provided elsewhere. (I&I § 5.02). None of these preconditions bars the present action. There is an Event of Default as to the HELOCs that breach the loan-level warranties because EMC has failed to cure several of the alleged breaches of which it has been notified; once an Event of Default exists, Syncora may elect to seek any available remedy.[4] The Note Insurer Default bar is temporary and applies only until Syncora resumes making claims payments under the policy. (Mem. in Opp. Mot. Summ. J. 3-4). On March 14, 2011, Syncora submitted a Declaration of its Deputy General Counsel James W. Lundy, Jr. affirming that Syncora is now current on its payment obligations. Whether Syncora's current status precludes it from recovering is a factual issue not raised on this motion, which simply considers whether Syncora is precluded solely by its failure to employ the repurchase protocol as to each allegedly defective loan. Finally, the MLPA omits Syncora from the list of parties for whom the repurchase protocol is the exclusive remedy. While several different remedies are expressly provided, the I&I clearly makes them cumulative, absent some express provision to the contrary.

EMC argues that, as third party beneficiary, Syncora is subjected to all of the MLPA's remedial limitations. It is not the case, however, that Syncora attempts to selectively assert its third party beneficiary status, enjoying the rights while avoiding the limitations. Rather, Syncora bargained for broader rights than would be conferred merely as third party beneficiary. See Schneider Moving & Storage Co. v. Robbins, 466 U.S. 364, 370-71 (1984) (holding that a third party beneficiary is not bound by contractual limitations "where the language of the contract, or

---

[4] The repurchase protocol is a low-powered sanction for bad mortgages that slip through the cracks. It is a narrow remedy ("onesies and twosies") that is appropriate for individualized breaches and designed to facilitate an ongoing information exchange among the parties. This is not what is alleged here. Here, Syncora alleges massive misleading and disruption of any meaningful change by distorting the truth. The futility of applying an individualized remedy to allegedly widespread misrepresentations is evident in the fact that, of the 1,300 loans actually submitted under the repurchase protocol, EMC has remedied only 20. This .015% success rate does not bode well for the efficiency of employing the repurchase protocol for a generalized claim of breach. Accordingly, EMC cannot reasonably expect the Court to examine each of the 9,871 transactions to determine whether there has been a breach, with the sole remedy of putting them back one by one. This transaction was put together in days and months. It is now in its second year of litigation.

the circumstances under which it was executed, establish that the parties have provided that the right of the beneficiary is not to be affected by any defenses that the promisor might have against the promisee"). Here, the I&I expressly confers third party beneficiary status only with respect to the rights granted to the Note Insurer in the Operative Documents, not generally or with respect to its limitations. Moreover, Syncora only asserts its rights as third party beneficiary in the second cause of action. It brings the other causes of actions under the I&I, incorporating the representations of the MLPA. See, e.g., S.S. Silberblatt, Inc. v. E. Harlem Pilot Block—Bldg. 1 Hous. Dev. Fund. Co., 608 F.2d 28, 40 (2d Cir. 1979) (holding that contractual defenses do not apply when a party sues for quantum meruit, not as a third party beneficiary).

Finally, the Accrual Limitation in MLPA § 7 only binds Syncora to the extent that Syncora employs the repurchase protocol. Its language and placement in the contract indicate that, in order to enforce EMC's compliance with the repurchase protocol, its obligations must have been triggered by notice and failure to cure. This accrual has no bearing on the remedies under the I&I, such as a cause of action for breach. In addition, I&I § 4.03(a) bars EMC from asserting the Accrual Limitation as a defense.

Accordingly, Syncora's causes of action are not limited to those loans that were submitted under the MLPA's repurchase protocol and the motion for partial summary judgment is GRANTED. The Clerk of Court is directed to terminate the motion at Docket # 38.

Dated: New York, New York
March 25, 2011

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge

11