```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
SYNCORA GUARANTEE INC., f/k/a XL       :
Capital Assurance Inc.,                :
                                       :
                    Plaintiff,         :     09 Civ. 3106 (PAC)
                                       :
         -against-                     :     OPINION & ORDER
                                       :
EMC MORTGAGE CORPORATION,              :
                                       :
                    Defendant.         :
--------------------------------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 19, 2012

HONORABLE PAUL A. CROTTY, United States District Judge:

Syncora Guarantee Inc. ("Syncora") alleges that EMC Mortgage Corporation ("EMC") breached its representations and warranties made to induce insurance provided by Syncora for a securitization transaction (the "Transaction") involving 9,871 Home Equity Line of Credit ("HELOC") residential mortgage loans. EMC aggregated these mortgage loans and sold them to a trust, which in turn issued notes to investors. Many of these HELOCs were "subprime," which defaulted after the housing market collapsed in 2008. Syncora, formerly known as XL Capital Assurance Inc., insured the Transaction to guarantee payments on the securities to senior note holders (the "Policy"). Syncora also entered into an Insurance and Indemnity Agreement ("I&I") with EMC, which contained representations and warranties from EMC, as well as remedies for breach of those warranties. The I&I made Syncora a third-party beneficiary of EMC's representations and warranties contained in a Mortgage Loan Purchase Agreement ("MLPA"), and gave Syncora the right to enforce remedies in the MLPA. Syncora alleges that as a result of EMC's breaches of the representations and warranties, Syncora paid over $168.6 million in claims, and that it continues to face exposure under the Policy.

1

On March 31, 2009, Syncora filed its Complaint alleging breach of contract, breach of the representations and warranties, and indemnification. Syncora also seeks attorneys' fees and costs. Discovery is ongoing and contentious. Syncora now moves for partial summary judgment and requests three rulings: (1) pursuant to a repurchase provision in the MLPA, EMC was obligated to repurchase loans at the time its representations and warranties were breached (i.e. at the time of the closing of the Transaction), regardless of whether EMC's breaches caused any loan to default; (2) that Syncora may establish EMC materially breached the I&I by showing EMC's breaches of representations and warranties as of the closing date of the Transaction materially increased Syncora's risk of loss on the Transaction, even if EMC's breaches did not directly cause Syncora's claim payments; and (3) notwithstanding that the Policy is irrevocable, the Court may grant Syncora equitable relief equivalent to rescission (claim payments less premiums). For the reasons discussed below, the Court grants Syncora's first and second requested rulings but denies its third request concerning the availability of equitable relief.

## BACKGROUND

In late 2006, EMC, a subsidiary of Bear Stearns, purchased 9,871 HELOCs with an aggregate principal balance of over $666 million from mortgage lender GreenPoint Mortgage Funding, Inc. (Compl. ¶ 30). In March, 2007, EMC, acting on the direction of Bear Stearns, securitized these loans by pooling them into mortgage-backed securities (the "Notes"), which were issued to investors through a trust. (Id. ¶¶ 30, 32). The principal and interest payments from the HELOCs were to provide cash flow for principal and interest payments on the Notes. (Id. ¶ 36). Syncora insured the investors' returns on a class of these Notes.

When the Transaction closed on March 6, 2007 (the "Closing Date"), the parties executed several agreements that form the basis for this litigation. These agreements include the

Insurance and Indemnity Agreement (Declaration of Philip R. Forlenza ("Forlenza Decl.") Ex. 1 ("I&I")); Financial Guaranty Insurance Policy (Forlenza Decl. Ex. 2 (the "Policy")); Mortgage Loan Purchase Agreement (Forlenza Decl. Ex. 3 ("MLPA")); and the Sale and Servicing Agreement (Forlenza Decl. Ex. 4 ("SSA")) (collectively the "Operative Documents").  Although Syncora did not sign the MLPA and SSA, Syncora is a third-party beneficiary of those agreements.  (I&I §§ 2.01(n), 2.02(j).)

The Policy provided by Syncora insures the most senior, or investment grade, note holders against any shortfall from the underlying loans.  (Compl. ¶ 35.)  The insurance obligation is irrevocable and unconditional.  (Forlenza Decl. Ex. 2.)  Syncora asserts that as an inducement to issue the Policy, EMC entered into the I&I and made a series of representations and warranties which Syncora relied upon in evaluating the risk of insuring the Transaction.  (Compl. ¶ 33.)  These representations and warranties included "transactional warranties," regarding EMC's operations and the Transaction as a whole, (I&I § 2.01(i), (l), (m)); and "loan-level warranties," which relate to the characteristic of the underlying loan pool and individual loans, as well as the practices used to originate, underwrite, and service those loans.  (Id. § 2.01(j), (n)).  The I&I's loan-level warranties largely incorporate and restate the guarantees in the other Operative Documents, particularly Section 7 of the MLPA, "for the benefit of [Syncora]."  (Id. §§ 2.01(n), 2.02 (j)).

The I&I grants Syncora broad rights and remedies in exchange for the risk it assumed under the Policy.  Specifically, the I&I provides Syncora indemnification rights against EMC "from and against any and all claims, losses, [and] liabilities . . . of any nature arising out of or relating to the breach by EMC . . . of any of the representations or warranties contained in Section 2.01 [of the I&I]" or those contained in the Operative Documents.  (Id. § 3.04(a)(iv).)

The I&I also specifies that if any of EMC's representations or warranties in the I&I or Operative Documents "shall prove to be untrue or incomplete in any material respect," the breach "shall constitute an Event of Default . . . unless remedied under the Operative Documents." (Id. § 5.01(a).)  In the event of a default by EMC, provided Syncora has not defaulted and other conditions are satisfied, the I&I allows Syncora to "take whatever action at law or in equity" is necessary to collect any amounts due under the I&I "or to enforce performance and observance of any obligation, agreement or covenant of EMC . . . under [the I&I] or any other Operative Documents."  (Id. § 5.02(a)(vi).)

The MLPA, in turn, grants Syncora (the "Note Insurer") additional remedies in the event that EMC (the "HELOC Seller") breaches any representation or warranty contained in Section 7 of the MLPA.  One of these remedies, a "repurchase provision," states in relevant part:

> Upon discovery or receipt of notice by the HELOC Seller . . . or the Note Insurer of a breach of any representation or warranty of the HELOC Seller set forth in this Section 7 which materially and adversely affects the value of the interests of the Purchaser, the Noteholders, the Indenture Trustee or the Note Insurer in any of the HELOCs . . . or which adversely affects the interests of the Note Insurer, the party discovering or receiving notice of such breach shall give prompt written notice to the others.  In the case of any such breach of a representation or warranty set forth in this Section 7, within 90 days from the date of discovery by the HELOC Seller, or the date the HELOC Seller is notified . . . , the HELOC Seller will either (i) cure such breach in all material respects, (ii) repurchase the affected HELOC at the applicable Purchase Price or (iii) if within two years of the Closing Date, substitute a qualifying Substitute HELOC in exchange for such HELOC . . . .

(MLPA § 7.)

On June 25, 2010, Syncora moved for partial summary judgment, arguing that under the repurchase provision, it was not required to identify the breaches as to each loan.  Rather, Syncora sought a pool-wide remedy based on sampling and extrapolation from the total loan portfolio.  Alternatively, it sought a ruling in limine that proof of its claims for breach of loan-

4

level warranties would not be limited to those loans submitted to EMC under the repurchase protocol. On March 25, 2011, the Court granted Syncora's motion for partial summary judgment. See Syncora Guarantee Inc. v. EMC Mortg. Corp., No. 09 Civ. 3106, 2011 WL 1135007 (S.D.N.Y. Mar. 25, 2011). Syncora now seeks to resolve threshold questions of law that control its burden to establish EMC's liability for breach of the repurchase provision and I&I, as well as whether the equitable relief sought is available.

## DISCUSSION

Summary judgment is proper if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).

Under New York law, "the initial interpretation of a contract is a matter of law for the court to decide." K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996) (internal quotation and citation omitted). When interpreting a written contract, the Court seeks "to give effect to the intention of the parties as expressed in the unequivocal language they have employed." British Int'l. Ins. Co. Ltd. v. Seguros La Republica, S.A., 342 F.3d 78, 82 (2d Cir. 2003) (citation omitted). Where a contract is ambiguous, the issue "should be submitted to the trier of fact." Consarc Corp. v. Marine Midland Bank N.A., 996 F.2d 568, 573 (2d Cir.

1993). "As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading." United Air Lines, Inc. v. Ins. Co. of State of Pa., 439 F.3d 128, 134 (2d Cir. 2006) (citation omitted). Where a contract is unambiguous, however, the Court looks to the language of the agreement and gives the words and phrases their plain meaning, as "the instrument alone is taken to express the intent of the parties." Klos v. Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997); see also Brooke Grp. v. JCH Syndicate, 663 N.E.2d 635, 638 (N.Y. 1996). When interpreting an unambiguous contract, "the court is to consider its '[p]articular words' not in isolation 'but in light of the obligation as a whole and the intention of the parties manifested thereby.'" JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009) (quoting Kass v. Kass, 91 N.Y.2d 554, 566 (1998)). A contract should not be interpreted so as to render a clause superfluous or meaningless. Galli v. Metz, 973 F.2d 145, 149 (2d Cir.1992). "[I]t is the general rule that written contracts executed simultaneously and for the same purpose must be read and interpreted together." Liberty USA Corp. v. Buyer's Choice Ins. Agency, 386 F. Supp. 2d 421, 425 (S.D.N.Y. 2005).

> A. The Repurchase Provision Does Not Require Syncora to Prove that EMC's Alleged Warranty Breaches Caused HELOC Loans to Default

Syncora contends it insured the Transaction based on the truth of EMC's representations and warranties concerning the HELOC loans. When EMC allegedly breached those warranties, Syncora's overall risk of loss on the Policy increased. Syncora argues that this increased risk harmed its interests as an insurer by preventing it from accurately gauging the risk profiles of the loans as of the Closing Date, and that EMC's alleged breaches are sufficient to trigger EMC's duties under the repurchase provision without regard to post-closing events.

EMC argues that the alleged breaches cannot support Syncora's repurchase claims unless Syncora shows that the breached warranties caused any of the HELOC loans to default. EMC

contends that since the language in the repurchase provision is susceptible to other reasonable interpretations, the contract is ambiguous, and that summary judgment is inappropriate in these circumstances.

The repurchase provision requires EMC to cure, repurchase, or substitute HELOC loans in the event that EMC breaches any loan-level representation or warranty. This duty arises only where the breach "materially and adversely affects the value of the interests of the Purchaser, the Noteholders, the Indenture Trustee or the Note Insurer in any of the HELOCs," or where the breach "adversely affects the interests of the Note Insurer." (MLPA § 7.) Under Syncora's reading, a breach of the representations and warranties is itself an "adverse effect" on its interests as an insurer sufficient to trigger the repurchase remedy. EMC argues that Syncora's interpretation renders the "adversely affects" requirement meaningless, and that the language requires Syncora to show actual pecuniary loss resulting from a breach. Whether a breach of representations and warranties alone can trigger the repurchase provision turns in part on the nature and scope of an insurer's "interests" under New York law.

New York law provides that an insurer has an interest in receiving complete and accurate information before deciding whether to issue a policy. See Lin v. Metropolitan Life Ins. Co., No. 07 Civ. 3218, 2009 WL 806572, at *1 (S.D.N.Y. Mar. 30, 2009); N.Y. Ins. Law § 3105(a) (defining "representation" as "a statement as to past or present fact, made to the insurer by . . . the applicant for insurance or the prospective insured, at or before the making of the insurance contract as an inducement to the making thereof"). "Insurance is the business of pricing risk; and it cannot function efficiently if the insured conceals or misrepresents the risks a policy covers." Lin, 2009 WL 806572, at *1. Indeed, New York law recognizes that an insurer may rescind a policy where an insurer has relied on a material misrepresentation, and where

7

"knowledge . . . of the facts misrepresented would have led to a refusal by the insurer to make such contract." Mut. Benefit Life Ins. Co. v. JMR Elecs. Corp., 848 F.2d 30, 32 (2d Cir. 1988) (per curiam) (quoting N.Y. Ins. Law § 3105(b)) (emphasis removed). See also Vella v. Equitable Life Assurance Soc. of U.S., 887 F.2d 388, 391 (2d Cir. 1989) (compiling cases); N.Y. Ins. Law § 3106(b) ("A breach of warranty shall not avoid an insurance contract or defeat recovery thereunder unless such breach materially increases the risk of loss, damage or injury within coverage of the contract.").

It is true that EMC is not an insured under the Policy, and that the rescission remedies normally available to an insurer do not apply in this case. Nonetheless, those factors do not bear upon Syncora's interests as an insurer, or whether a breach of EMC's representations and warranties could adversely affect those interests on the Closing Date. The reasons that underly an insurer's right of rescission—namely, reliance on an insured's representations and warranties—apply equally here. Syncora stands as a third-party beneficiary under the MLPA and other Operative Documents. The I&I incorporated EMC's representations and warranties as to the accuracy of material information about the HELOC loans. (I&I §§ 2.01(l); 2.02(j).) Syncora relied on EMC's representations and warranties in deciding whether to insure the Transaction and how to price that risk.[1] Indeed, the truthfulness of these representations and warranties as of the Closing Date was a condition precedent to Syncora's obligation to issue the Policy. (Id. § 3.01 (c).) A breach of these warranties, if proven,[2] would have adversely affected Syncora's interests as an insurer.

---

[1] As counsel for Syncora observed at oral argument, Syncora received 71 warranties before issuing the Policy precisely because "its vital interest is in the risk attributes of the underlying collateral." (June 13, 2012 Oral Argum. Tr. at 7:22-25.)

[2] The merits of Syncora's underlying breach allegations are not before the Court on its motion for partial summary judgment.

EMC contends that any increased risk to Syncora as a result of the alleged breaches does not adversely affect Syncora's interest unless the breach caused a loan to default. (Def's Mem. at 15-16.) In essence, EMC argues, the repurchase provision contemplated a remedy only where breached representations and warranties caused actual adverse effect, and not simply an increase in risk. But nothing in the language of the parties' agreements provides for this result, and New York law does not support EMC's construction. See, e.g., Paneccasio v. Unisource Worldwide, 532 F.3d 101, 111 (2d Cir. 2008).

Contrary to EMC's argument, the parties' written agreements do not provide that breaches of representations or warranties must cause any HELOC loan to default, before the Note Insurer can enforce its remedies under the repurchase provision. Had the parties intended this requirement, they could have included such language. They did not, and the Court will not do so now "under the guise of interpreting the writing." See Reiss v. Fin. Performance Corp., 97 N.Y.2d 195, 199 (2001) (citation omitted). Rather, the plain language of the parties' agreements suggests that this omission was deliberate.

The I&I provides that if any of EMC's representations or warranties in the I&I or Operative Documents "shall prove to be untrue or incomplete in any material respect," the breach "shall constitute an Event of Default . . . unless remedied under the Operative Documents." (Id. § 5.01(a).) This provision makes clear that the parties intended for Syncora to have remedies available in the event of a breached representation or warranty, regardless of whether the breach caused Syncora to suffer actual pecuniary loss. Moreover, Section 2.05(a) of the SSA provides Syncora with a repurchase remedy for defective loans that are not yet in default. The provision states in relevant part:

> Notwithstanding any contrary provision of this Agreement, with respect to any HELOC that is not in default or as to which default is not reasonably foreseeable,

9

> no repurchase or substitution pursuant to Sections 2.02, 2.03, or 2.04 shall be made unless [EMC] delivers to . . . the Note Insurer . . . an Opinion of Counsel . . . to the effect that such repurchase or substitution would not (i) result in the imposition of the tax on "prohibited transactions" of any REMIC created pursuant to the Indenture or contributions after the Closing Date . . . .

(SSA § 2.05(a).) The applicable treasury regulation, in turn, allows repurchase of defective loans from RMBS trusts, even where those loans are still performing, provided that the mortgage "does not conform to a customary representation or warranty given by the sponsor or prior owner of the mortgage regarding the characteristics of the mortgage, or the characteristics of the pool of mortgages of which the mortgage is a part." 26 CFR § 1.860G-2(f)(1)(iv). Although Section 2.05(a) of the SSA addresses a special circumstance where a repurchase remedy is available, the plain language of that provision makes clear that the parties intended Syncora to have a repurchase remedy even if there is no defaulting loan. Set in this context, EMC's proposed construction of the MLPA repurchase provision has no support in the parties' agreements. See Fed. Ins. Co. v. Am. Home Assurance Co., 639 F.3d 557, 568 (2d Cir. 2011) (stating that when interpreting a contract, the "court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning") (citation omitted); Liberty USA Corp., 386 F. Supp. 2d at 425.

In the securitization context, at least one New York court has enforced repurchase provisions where representations and warranties as to the quality of defaulting loans were breached, regardless of whether the breach caused the default. In LaSalle Bank N.A. v. Nomura Asset Capital Corp., No. 0603339/2003, slip op. (N.Y. Sup. Ct., Sept. 8, 2006), aff'd in part, 846 N.Y.S.2d 95 (App. Div. 2007), plaintiff served as trustee for the note holders of a pool of securitized commercial mortgage loans. Id. at 1. Plaintiff alleged that defendants breached

various representations and warranties as to certain loans, and sought to enforce a repurchase provision under a mortgage loan purchase and sale agreement and pooling and servicing agreement. Id. at 31. On a motion in limine, plaintiff sought to exclude evidence as to whether the defendants' breaches caused the loans at issue to default. Id. at 44. As in this case, the defendants argued that the plaintiff "is seeking, as a matter of law, to make the defendants liable for damages without having to demonstrate causation, and, as such, is not proper under contract law." Id. at 44. The court recognized that on a claim for breach of contract and a breach of the underlying representations and warranties, "a plaintiff must establish that the breach 'would not have occurred but for the activities of the defendant.'" Id. (quoting Cantor Fitzgerald Assocs., L.P. v. Tradition N. Am., Inc., 749 N.Y.S.2d 249, 249, (App. Div. 2002)). Nevertheless, the court gave "full credence to the purposes of the parties in the formation of the contract" and found "nothing in the MLPSA that requires the plaintiff to show a causal link between the breach and the requirement that the defendants (the Sellers of the Mortgage Loans) either repurchase the loans . . . or [] cure the breach in all material aspects." Id.

     MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 936 N.Y.S.2d 513 (Sup. Ct. N.Y. County 2012), is also instructive. Plaintiff MBIA agreed to insure fifteen residential mortgage-backed securitizations comprised of mortgage loans originated or acquired by defendant Countrywide. 936 N.Y.S.2d at 516. MBIA alleged that in evaluating the risk associated with insuring the transaction, it relied on various representations and warranties made by Countrywide in the underlying transaction documents. Id. at 517. The loans subsequently defaulted in the wake of the housing and credit crisis, and MBIA paid insurance claims to cover payments due to investors in the securitizations. In its complaint, MBIA alleged that Countrywide fraudulently induced MBIA to insure the securitizations, that Countrywide breached various representations

and warranties in the underlying transaction documents and insurance agreements, and that Countrywide breached its obligation to repurchase the loans. Id. at 516.

In deciding MBIA's motion for partial summary judgment, the court explained that "the base issue in this motion is when causation occurs in claims for insurance fraud and breach of representations and warranties." Id. at 518. MBIA contended that the defendant's liability was triggered "when Countrywide made misrepresentations that were material and which induced MBIA to issue financial guaranty insurance policies when, had it known the true facts, it may have either declined to issue the policies or issued the policies on different terms." Id. at 518-19. Countrywide asserted that MBIA, "having chosen to seek damages for all payments it has or will make pursuant to the Insurance Policies, must prove that its claim payments were directly and proximately caused by Countrywide's alleged misrepresentations."[3] Id. at 519. The court found that "in this insurance context, with MBIA as an insurance company and Countrywide as an applicant for insurance . . . , the claims are informed by New York common law and Insurance Law Sections 3105 and 3106." Id. at 521. For purposes of MBIA's fraud and breach of warranty claims, the court held that New York law is "clear that a material misrepresentation made at the time an insurance policy is being procured may lead to a policy being rescinded and/or avoided." Id. (citing cases). This rule "corresponds to a standard claim for fraud, in which fraud is complete when a misrepresentation is made that induces a party to take action and

---

[3] In support of its argument, Countrywide also relied in part on the Appellate Division's prior decision affirming denial of its motion to dismiss the complaint. Id. The trial court acknowledged "that wrongdoing causing loss must be proven before damages are levied has never been an issue for debate." Id. Nonetheless, the court found that, contrary to Countrywide's argument, the Appellate Division "did not hold that MBIA's claims payments must be directly shown to be caused by Countrywide's alleged misrepresentations." Id. (citing MBIA Ins. Corp. v. Countrywide Home Loans, Inc. et al., 87 A.D.3d 287, 928 N.Y.S.2d 229 (1st Dep't 2011)). Rather, the Appellate Division held that MBIA had sufficiently alleged loss causation to avoid Countrywide's motion to dismiss, as "it was foreseeable that MBIA would suffer losses as a result of relying on Countrywide's alleged misrepresentations about the mortgage loans." MIBA Ins. Corp., 87 A.D.3d at 296, 928 N.Y.S.2d 229.

that party suffers damages as a result."[4]  Id.  The court therefore found that there was "no basis in law . . . to mandate that MBIA establish a direct causal link between the misrepresentations allegedly made by Countrywide and claims made under the policy."  Id. at 521-22.  Thus, the court held that "MBIA must prove for its breach of warranty claim that Countrywide's alleged misrepresentations materially increased MBIA's risk of loss."  Id. at 522.  The same reasoning applies in this case.

On its claim for breach of the repurchase provision, which contained substantially similar language to that at issue in this case, MBIA also argued that it was not required to show that Countrywide's alleged breach of representations and warranties caused any loan to default.  Id. at 524.  Rather, MBIA asserted that it need only show "that its interest in the Mortgage Loans is materially and adversely affected by Countrywide's misrepresentations upon which MBIA relied in its decision to insure the Securitizations."  Id.  Notwithstanding MBIA's "strong argument," the court denied summary judgment because the evidence did not show that the parties' Sales and Servicing Agreement applied to all of the loans at issue.  Id. at 526.  Here, there is no suggestion that the Operative Documents did not apply uniformly to all of the HELOC loans in the Transaction.

The court in MIBA Ins. Corp. also found that the repurchase provisions at issue "are subject to varying interpretations regarding 'interest' and affect on interest."  Id.  The court did not explain its reasoning, however, and cautioned that its decision "does not hold, by implication, that MBIA must show that a breach of a representation or warranty caused a loan's non-performance, or that Countrywide is not contractually obligated to repurchase misrepresented loans.  The holding is limited solely to the MBIA's burden of proof on its motion for summary

---

[4] Syncora does not allege fraud against EMC.  MBIA Ins. Corp. is instructive only to the extent that the court applied this reasoning to MBIA's burden on its claim for breach of warranty.

13

judgment." Id.  Accordingly, to the extent the court denied summary judgment on the basis that the parties' repurchase provision was ambiguous, MIBA Ins. Corp. is not persuasive.

EMC cites LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc., No. 01 Civ. 4389, 2002 WL 181703 (S.D.N.Y. Feb. 5, 2002), in support of its argument.  In that case, plaintiff served as trustee of a pool of securitized commercial mortgage loans.  Defendant had made certain representations and warranties to plaintiff as to the nature of the loans in a Pooling and Servicing Agreement.  2002 WL 181703, at *1.  In the event that defendant breached a representation or warranty "which . . . breach . . . materially and adversely affects the value of such [loan] or the interests of the Certificateholders therein," the Agreement required defendant to cure the breach or repurchase the loan.  Id. at *3.  After one of the loans defaulted, plaintiff alleged that defendant breached various representations and warranties, and sought to enforce the repurchase provision.  Id. at *2.  The court found that plaintiff "must allege two elements: (i) breach of a representation or warranty . . . , and (ii) a material and adverse effect caused by the breach."  Id. at *3.  Defendant argued that plaintiff failed to allege that any of the asserted breaches had the requisite material adverse effect.  Id.  The court held that plaintiff had adequately stated a claim because "[t]he default is a material adverse effect," and the alleged breaches were "at least a partial cause," or "contributed to the default on the mortgage loan."  Id. at *4-5. LaSalle, however, did not involve an insurer with legally distinct interests from those of the certificateholders.  Here, the language of the parties' repurchase provisions reflects this distinction; EMC's repurchase obligation is triggered when a breach of a representation or warranty "adversely affects the interests of the *Note Insurer*."  (MLPA § 7) (emphasis added). LaSalle is therefore inapposite, and EMC's argument that "[a]n increase in risk, without actual,

existing harm, does not satisfy the 'adversely affects' requirement," (Def's Mem. at 15), is without merit.[5]

Accordingly, the requirement in Section 7 of the MLPA that a breach of a representation and warranty must "adversely affect[] the interests of the Note Insurer" is not ambiguous. EMC's proposed construction has no basis in the plain language of the parties' agreements. Syncora need not prove that the allegedly breached representations and warranties caused any of the HELOC loans to default in order to show that its interests as an insurer were adversely affected for purposes of triggering EMC's repurchase obligation under the MLPA.

### B. Syncora Can Establish a Material Breach of the I&I by Showing that EMC's Alleged Breaches Materially Increased Syncora's Risk of Loss

Syncora also asserts that to prevail on its claim for material breach of the I&I, it need only show that EMC's breaches of the representations and warranties increased Syncora's risk of loss at the time of the Closing Date. (Pl's Mem. at 17.) Here, Syncora relies on Section 3106 of the New York Insurance Law, which provides: "A breach of warranty shall not avoid an insurance contract or defeat recovery thereunder unless such breach materially increases the risk of loss, damage or injury within coverage of the contract." N.Y. Ins. Law § 3106(b). The statute defines "warranty" as "any provision of an insurance contract which has the effect of requiring, as a condition precedent of . . . the insurer's liability thereunder, the existence of a fact which tends to diminish, or the non-existence of a fact which tends to increase, the risk of the occurrence of any loss, damage, or injury within the coverage of the contract." Id. § 3106(a).

---

[5] EMC's reliance on LaSalle Bank, N.A. v. CIBC Inc., No. 08 Civ. 8426, 2011 WL 4943341 (S.D.N.Y. Oct. 17, 2011), is misplaced for substantially similar reasons. That case concerned whether a material breach adversely affected the interests of note holders rather than the note insurer. The court denied summary judgment for plaintiff "because there exists a genuine dispute as to whether the Second Mortgage materially and adversely affected the Property, the Loan, or the interests of the investors." Id. at *4.

The I&I provides that Syncora will issue the Policy on the Closing Date "subject to satisfaction of the conditions precedent . . . on or prior to the Closing Date." (I&I § 3.01.) One of those conditions precedent required that "the representations and warranties of EMC . . . shall be true and correct on and as of the Closing Date . . . ." (Id. § 3.01 (c).) The breaches of those representations and warranties, if proven, would have increased the risk of loss on the Policy. Consistent with the rationale underlying the insurance law principles discussed above, Syncora may establish a material breach of the I&I by proving that EMC's alleged breaches increased Syncora's risk of loss on the Policy, irrespective of whether the breaches caused any of the HELOC loans to default. See MIBA Ins. Corp., 936 N.Y.S.2d at 521-22.

EMC argues that Section 3106(b) does not apply because "(a) Syncora is not rescinding an insurance contract; (b) it does not provide for monetary damages; and (c) it is a defense to the payment of insurance claims, not a sword to recover damages against a third party." (Def's Mem. at 20-21.) EMC completely misapprehends Syncora's argument. Syncora does not dispute that it issued an irrevocable policy for the benefit of the note holders. Nor is Syncora arguing that § 3106(b) creates a right for damages where a rescission remedy does not lie. Rather, § 3106(b) recognizes the insurance law principle that an insurer relies on receiving complete and accurate information when deciding whether to issue a policy and how to price risk, and that a material breach of a representation or warranty can adversely affect an insurer's interests as a matter of law. See Glickman v. New York Life Ins. Co., 291 N.Y. 45, 51-52 (1943) (affirming dismissal of suit on life insurance policy where insured failed to disclose intestinal ulcer in his policy application, and stating that "[t]he fact that the applicant died from another cause does not disprove the increase of risk"). Whether the insured trust was a party to the I&I is irrelevant for purposes of Syncora's claim, as the I&I expressly provides that the

truthfulness of EMC's representations and warranties on the Closing Date was a condition precedent to Syncora's agreement to issue the Policy.[6] (I&I § 3.01 (c).) Accordingly, Syncora is entitled to partial summary judgment on this issue.

    C.   Syncora is Not Entitled to a Ruling on Equitable Relief

Lastly, Syncora requests a ruling that, provided it succeeds in proving its claims, the Court has the power in equity to award relief equivalent to rescission, namely claim payments less premiums. There is no question as to the Court's equitable powers. At this stage, however, without a complete factual record, it would be premature to consider what equitable relief, if any, is appropriate.

Under New York law, the "rescission of a contract is an extraordinary remedy." Nolan v. Sam Fox Publ'g Co., 499 F.2d 1394, 1397 (2d Cir. 1974). It may be invoked "only when there is lacking [a] complete and adequate remedy at law and where the status quo may be substantially restored." Rudman v. Cowles Commc'ns, Inc., 30 N.Y.2d 1, 13 (1972). In order to justify equitable rescission (or, in this case, its equivalent), "a party must allege fraud in the inducement of the contract; failure of consideration; an inability to perform the contract after it is made; or a breach in the contract which substantially defeats the purpose thereof." New Paradigm Software Corp. v. New Era of Networks, Inc., 107 F. Supp. 2d 325, 329 (S.D.N.Y. 2000) (citation omitted).

Even though the Court has the power to fashion an equitable remedy where rescission is not available, see First Nat'l Bank of Cincinnati v. Pepper, 454 F.2d 626, 635 (2d Cir. 1972), there has been no demonstration why damages and the other remedies available to Syncora under

---

[6] Indeed, EMC acknowledges that its obligations to Syncora under the I&I are "completely separate" from Syncora's obligations to the trust under the Policy. (Def's Mem. at 22.) EMC's argument that Syncora is attempting to "shift its insurance obligations to EMC" is therefore disingenuous.

17

the I&I are not adequate. (See, e.g., I&I § 3.04(a)(iv) (providing Syncora indemnification rights "from and against any and all claims, losses, [and] liabilities . . . of any nature arising out of or relating to the breach by EMC" of the representations or warranties in Section 2.01 of the I&I or those contained in the Operative Documents).) Whether Syncora may seek equitable remedies requires the Court to make factual determinations for which there is no support in the record at this stage. Accordingly, the Court denies partial summary judgment for Syncora on this issue.

## CONCLUSION

Syncora's motion for partial summary judgment is granted in part and denied in part. The Court grants Syncora's first and second requested rulings concerning its burden of proof. Under Section 7 of the MLPA, Syncora need not prove that EMC's alleged warranty breaches caused HELOC loans to default in order to trigger EMC's repurchase obligations. Second, Syncora can establish a material breach of the I&I by showing that EMC's alleged breaches materially increased Syncora's risk. Finally, the Court denies Syncora's request for a ruling that the Court has the power in equity to award Syncora relief equivalent to rescission. The Clerk of Court is directed to terminate this motion at Docket No. 101.

Dated: New York, New York
June 19, 2012

SO ORDERED

*Paul Crotty*

PAUL A. CROTTY
United States District Judge