UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
SYNCORA GUARANTEE INC., formerly known :
as XL CAPITAL ASSURANCE INC., :
:
:
            *Plaintiff,* :
:   Index No.  09 CV 3106 (PAC)
         vs. :
:
EMC MORTGAGE CORPORATION, :
:
            *Defendant.* :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OF LAW IN OPPOSITION TO
# EMC MORTGAGE LLC'S MOTION FOR RECONSIDERATION OF
# THE COURT'S JUNE 19, 2012 SUMMARY JUDGMENT ORDER

Philip R. Forlenza
Erik Haas
Matthew J. Shepherd
A. Leah Vickers
Anthony C. DeCinque
Jason R. Vitullo

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Telephone:  (212) 336-2000
Fax:  (212) 336-2222

prforlenza@pbwt.com
ehaas@pbwt.com
mjshepherd@pbwt.com
adecinque@pbwt.com
lvickers@pbwt.com
jvitullo@pbwt.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................1

LEGAL STANDARD...............................................................................................................1

ARGUMENT.............................................................................................................................2

I. The Court Correctly Ruled That the Unambiguous Language Provides That Syncora's Interests Are Adversely Affected When, As of Closing, a Breach of Warranty Causes an Increase in Risk. ...........................................................................4

    A. The Court's ruling does not render the words "adversely affects" superfluous. .............4

    B. The Court correctly adopted Syncora's interpretation of "interests of the Note Insurer," and rejected EMC's unreasonable interpretation.............................................6

    C. The Court correctly rejected EMC's exclusionary interpretation of the repurchase provision. ......................................................................................................8

II. The Extrinsic Evidence EMC Offers Is Irrelevant and Misleading. .....................................10

    A. The extrinsic evidence is irrelevant. ...............................................................................10

    B. EMC repeats evidence it already presented to the Court..............................................10

    C. EMC's misleading reference to purportedly new extrinsic "evidence" does not support its position.........................................................................................................12

CONCLUSION..........................................................................................................................15

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Anglo Am. Ins. Group, P.L.C. v. Calfed Inc.*,
  940 F. Supp. 554 (S.D.N.Y. 1996) .......................................................................................10

*Castillo v. Time Warner Cable of New York City*,
  09 Civ. 7644, 2011 U.S. Dist. LEXIS 123271 (S.D.N.Y. Oct. 24, 2011) ..................................1

*Chock Full O'Nuts Corp. v. Tetley Inc.*,
  94 Civ. 8262, 1997 U.S. Dist. LEXIS 11605 (S.D.N.Y. Aug. 8, 1997) ....................................9

*Cordero v. Astrue*,
  574 F. Supp. 2d 373 (S.D.N.Y. 2008)......................................................................................2

*LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.*,
  No. 01 Civ. 4389, 2002 WL 181703 (S.D.N.Y. Feb. 5, 2002) ................................................14

*Retrofit Partners I, L.P. v. Lucas Indus.*,
  201 F.3d 155 (2d Cir. 2000).................................................................................................10

*Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*,
  13 N.Y.3d 398 (2009) ........................................................................................................9, 10

*Shrader v. CSX Transp. Inc.*,
  70 F.3d 255 (2d Cir. 1995).....................................................................................................1

*Tradition Chile Agentes de Valores Ltda. v. ICAP Sec. USA LLC*,
  09 Civ. 10343, 2011 U.S. Dist. LEXIS 4762 (S.D.N.Y. Jan. 11, 2011)...................................2

*United States v. Potamkin Cadillac Corp.*,
  697 F.2d 491 (2d Cir. 1983).................................................................................................11

**PRELIMINARY STATEMENT**

EMC's motion for reconsideration is improper and disingenuous.

It ignores the clear admonition that motions for reconsideration should not be used to reargue points previously made and rejected by the Court.

It bases its audacious assertion that the Court "may have overlooked" and "did not heed" the "cardinal canon of contract construction" on patent distortions of the Court's ruling and rationale.

It cites irrelevant extrinsic evidence that has been in its possession since long before the briefing of Syncora's motion.  And it misconstrues that evidence, in one case flagrantly.

We therefore respectfully submit that EMC's motion should be denied as improper and utterly without merit.

**LEGAL STANDARD**

"The Court grants reconsideration of its prior orders only in extraordinary circumstances.  Otherwise the 'interest of finality and conservation of scarce judicial resources' would be at risk."  *Castillo v. Time Warner Cable of New York City*, 09 Civ. 7644, 2011 U.S. Dist. LEXIS 123271, at *2 (S.D.N.Y. Oct. 24, 2011) (Crotty, J.) (quoting *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 407 (S.D.N.Y. 2010)).  Thus, "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Shrader v. CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

A motion for reconsideration "is not intended to be a vehicle for a party dissatisfied with a court's ruling to advance new theories that the movant failed to advance in

connection with the underlying motion, nor to secure a rehearing on the merits with regard to issues already decided." *Cordero v. Astrue*, 574 F. Supp. 2d 373, 380 (S.D.N.Y. 2008); *see also Tradition Chile Agentes de Valores Ltda. v. ICAP Sec. USA LLC*, 09 Civ. 10343, 2011 U.S. Dist. LEXIS 4762, at *2 (S.D.N.Y. Jan. 11, 2011) ("Reconsideration is not an invitation for parties to treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings.") (internal citation omitted).

## ARGUMENT

In its June 19, 2012 Opinion (the "Opinion"), this Court held that the language of the repurchase provision unambiguously provides that Syncora may invoke the provision by showing that a breach of warranty caused a loan to be riskier than warranted, and that Syncora need not prove that a breach "caused any of the HELOC loans to default in order to show that its interests as an insurer were adversely affected." Op. at 15. The Court held that its construction was consistent with the plain language of the repurchase provision and the clear intent of the parties, thus rejecting EMC's contention that the contract language was "at best" ambiguous.

At the outset of its brief, EMC purports to be "mindful that a motion for reconsideration should not be used to relitigate issues already decided by the Court." (EMC Br. at 1.) Yet EMC proceeds to do precisely that by simply repeating arguments that were briefed by the parties, discussed at oral argument, and decided by the Court in its Opinion. EMC has not proffered a single legitimate basis for reconsideration. It has not pointed to any overlooked controlling decisions or pertinent new evidence that could in any way disturb this Court's ruling; and EMC did not – and cannot – point to any clear error or manifest injustice that justifies reconsideration.

Instead, EMC simply asks the Court to reconsider the same arguments it briefed and raised at oral argument, which the Court acknowledged and then expressly rejected. Specifically, EMC attacks the Court's holding by reasserting that:  (1) the Court's interpretation of the repurchase provision renders the "adversely affects" language meaningless (EMC Br. at 6); and (2) the Court's interpretation of the contract is incorrect since Syncora's true interest – according to EMC – is not in risk but rather "in the actual performance of the loans" (*id.* at 9). Both arguments appeared throughout EMC's brief opposing Syncora's motion,[1] counsel for EMC expressly raised each of them during oral argument,[2] and this Court explicitly acknowledged them in its Opinion.[3]  In short, the Court did not overlook EMC's arguments; it carefully considered them and, applying established principles of contract interpretation, New York insurance law, and standards for summary judgment, explicitly rejected them.

Thus, EMC's true claim is not that the Court overlooked its arguments or controlling precedent, but rather that this Court reached the wrong conclusion.  Not only is this contention incorrect, it is also completely improper on a motion for reconsideration.  The failure of EMC to present any genuine grounds for reconsideration, by itself, justifies denial of its motion.  Nevertheless, Syncora will briefly respond to EMC's rehashed arguments and mischaracterizations of the record and evidence.

---

[1] *See*, *e.g.*, EMC Merits Br. at 16 ("Syncora's interpretation of the repurchase provision renders the phrase 'adversely affects' meaningless"); *id*. at 15 ("Syncora's only interest in this Transaction is that the HELOCs continue to generate cashflows to the trust").

[2] *See*, *e.g.*, Tr. at 23 ("MR SACKS: . . . Their construction would read adverse effect out of this agreement . . . ."); *id*. at 18 ("MR. SACKS: . . . The interest in this transaction, given [Syncora's] role, is solely that the HELOCs generate enough cash flows to cover the obligations to investors so they don't ever have to pay.  Their interest is in the cash flows that the loans generate.").

[3] *See* Op. at 7 ("EMC argues that Syncora's interpretation renders the 'adversely affects' requirement meaningless, and that the language requires Syncora to show actual pecuniary loss resulting from a breach"); *id*. at 9 ("EMC contends that any increased risk to Syncora as a result of the alleged breaches does not adversely affect Syncora's interest unless the breach caused a loan to default.").

I. **The Court Correctly Ruled That the Unambiguous Language Provides That Syncora's Interests Are Adversely Affected When, As of Closing, a Breach of Warranty Causes an Increase in Risk.**

In its Opinion, the Court accepted Syncora's contention that, in itself, a warranty breach that causes a loan to be riskier than warranted thereby "adversely affects" Syncora's "interests" at the time of the breach; and rejected EMC's contention that Syncora's interests can be adversely affected **only by** a breach that causes an actual pecuniary loss. (Op. at 6-9.) Despite the Court's principled rejection of EMC's arguments, EMC nevertheless contends that the Court's ruling was incorrect and should be revisited.

A. <u>The Court's ruling does not render the words "adversely affects" superfluous.</u>

The Court found that, under New York law, Syncora has an "interest" in the risk profile of the underlying loan collateral, and that this interest is "adversely affected" if, at the time of the transaction's closing, a loan is riskier that it was warranted to be by EMC. Thus, the Court considered the plain meaning of each term and correctly ruled that the repurchase provision unambiguously requires repurchase when a warranty breach causes an *increase in risk* to Syncora.

In its brief, EMC mischaracterizes Syncora's arguments and the Court's ruling to claim that the Court's construction of the repurchase provision renders the "adversely affects" language meaningless. EMC begins by selectively quoting the Court's statement that under Syncora's interpretation, "a breach of the representations and warranties is itself an 'adverse effect' on its interests as an insurer sufficient to trigger the repurchase remedy." (*See* EMC Br. at 6 (quoting Op. at 7).) EMC then construes the Court's *summary description* of Syncora's construction *as a ruling* that the repurchase remedy is triggered "whenever there is a breach,"

even if the breach does not "also have an adverse effect."[4] EMC's contention distorts both Syncora's proffered interpretation of the repurchase provision and the Court's ruling.

Contrary to EMC's assertion, Syncora did not seek a ruling that *any* warranty breach triggers the repurchase remedy. Rather, Syncora's consistent position has been that a breach of warranty adversely affects its interests when that breach *results in the loan being riskier than warranted*.[5] Indeed, counsel for Syncora made that very point at oral argument, explaining that Syncora has to show "a breach *that causes the loan to become riskier*." (Tr. at 4 (emphasis added).) After EMC countered that Syncora's construction would require only a "theoretical or hypothetical or potential adverse effect" (*id*. at 20), counsel for Syncora emphasized that "[w]e're not talking about . . . potential adverse effect. When a loan is *riskier than warranted*, there's an *actual adverse effect*." (*Id*. at 25-26 (emphasis added).) In other words, if a warranty breach causes an increase in risk, that *increase in risk* – which occurs at the time of the breach – *is* the adverse effect.[6]

It is clear from its opinion that the Court understood Syncora's interpretation and agreed that the plain reading required repurchase on a showing of an increase in risk. (*See, e.g.*, Op. at 6 ("Syncora argues that this increased risk harmed its interests as an insurer…."); *id.* at 8, n.1 (acknowledging that Syncora's "vital interest is in the risk attributes of the underlying collateral"); *id.* at 9 (explicitly rejecting EMC's contention "that any increased risk to Syncora as

---

[4] EMC Br. at 6 ("[Under the Court's construction] the 'adversely affects' language serves no purpose at all—the contract could have simply said that EMC is obligated to repurchase loans whenever there is a breach, which of courses it does not. Under this construction, there was no reason for the parties to have included the additional requirement that any breach also have an adverse effect.").

[5] *See*, *e.g.*, Syncora Merits Br. at 9 ("[T]he parties provided that the ***breach must adversely affect the Note Insurer's 'interests.'*** Of course, as an insurer, Syncora's 'interests' are impacted by an ***increase in risk***.") (emphasis added); *see also* Syncora Reply Br. at 4.

[6] EMC plainly understood Syncora's position previously, stating in its merits brief that, "[u]nder Syncora's construction, *if* a breach ***increases the risk profile*** of a loan, ***then*** the breach *ipso facto* 'adversely affects' its interests." (EMC Merits Br. at 16 (emphasis added).)

a result of the alleged breaches does not adversely affect Syncora's interest unless the breach caused a loan to default").)

The Court therefore ruled that an *increase in risk* at the time of closing as a result of a warranty breach constitutes an "adverse effect" on Syncora's interests sufficient to trigger the repurchase remedy, and simultaneously rejected EMC's contention that the repurchase provision could reasonably be interpreted to provide a remedy only where a breach causes an actual loss of income to the trust. (*Id.* at 9, 14-15.)  Thus, neither Syncora's interpretation nor the Court's ruling does anything to render the words "adversely affects" superfluous or meaningless.  To the contrary, the Court simply ruled that the contractual requirement of an "adverse effect" on Syncora's interests does not have the impermissibly narrow construction that EMC advanced.

    B.    <u>The Court correctly adopted Syncora's interpretation of "interests of the Note Insurer," and rejected EMC's unreasonable interpretation.</u>

EMC next disingenuously asserts that the Court's construction is based "fundamentally" on its assumption that the "interests of the Note Insurer" referenced in the repurchase provision are the insurer's "pre-contractual" interests in receiving complete and accurate information about the loans prior to agreeing to insure a transaction. (EMC Br. at 7.)[7]

Unquestionably, the Court did *not* rule that the phrase "interests of the Note Insurer" in the repurchase provision refers to Syncora's "pre-contractual" interests in receiving

---

[7] Once again, this argument was raised in EMC's merits brief and at oral argument, and the Court rejected it.  *See*, *e.g.*, EMC Merits Br. at 3;  ("Syncora's exclusive interest in the loans is in their income stream."); Tr. at 18 ("The interest in this transaction, given their role, is solely that the HELOCs generate enough cash flows to cover the obligations to investors so they don't ever have to pay.  Their interest is in the cash flows that the loans generate."); Op. at 9 (holding that "nothing in the language of the parties' agreement" provides that "breaches of representations or warranties must cause any HELOC loan to default, before the Note Insurer can enforce its remedies under the repurchase provision").

- 6 -

accurate information about the loans.[8]  To the contrary, the Court clearly and correctly recognized that Syncora has an interest in the "truthfulness of these representations and warranties," and that EMC's breaches of these warranties, if proven, "could adversely affect those interests *on the Closing Date*."  (Op. at 8 (emphasis added).)  Specifically, the Court held that (a) an insurer has an interest in the risk it is undertaking and the truthfulness of the warranties regarding that risk; and (b) these interests are "adversely affected" *when these warranties are breached at the time of the formation of the contract*.  (*Id.*)  The Court's ruling is entirely consistent with the parties' agreement, which states that the warranties are made "as of the Closing Date," I&I Agreement § 2.01, and is affirmed by New York insurance law, which recognizes an insurer's vital interest in being able to assess risk as of the execution of the insurance contract, (Op. at 7-8).

EMC also argues that "by its express terms," the repurchase provision contemplates triggering events "occurring post-transaction" because it "provides for the post-contract repurchase of individual loans where something happens to cause a breach to have an adverse effect on that loan."  (EMC Br. at 8.)  What this argument ignores is that warranties that are made as of the closing date are breached as of the closing date.  As the Court's opinion reflects, the repurchase remedy is triggered by "something [that] happens" (*id.*), as of the closing date that renders the warranties of fact untrue, and the breaching loan is therefore riskier than warranted at the time of closing.  (Op. at 8.)[9]  The fact that the parties agreed to a post-closing

---

[8] It is clear from the Court's opinion that its reference to an insurer's interest in receiving complete and accurate information is simply part of a broader discussion as to "the nature and scope of an insurer's 'interests' under New York law."  (Op. at 7.)  That broader discussion, which also includes reference to the significance of risk assessment to an insurer, is merely a preamble to and predicate for the Court's ultimate holding.

[9] Contrary to EMC's assertion (EMC Br. at 8), the Court did not define Syncora's interest as the "overall performance" of a pool of loans.  The Court simply noted that when EMC allegedly breached the loan-

remedy to address the post-closing *discovery* of a breach of warranty does not alter the irrefutable conclusion that the existence of breach is assessed as of closing.

        C.        <u>The Court correctly rejected EMC's exclusionary interpretation of the repurchase provision.</u>

Next, EMC asserts that "the Court did not acknowledge that there is nothing in the language of the contract that precludes EMC's interpretation." (EMC Br. at 2.) That's nonsense.

In finding that the contract language unambiguously supports Syncora's interpretation, the Court relied on New York insurance law regarding the nature and scope of an insurer's "interests," established rules of contract construction, and the plain meaning of the language chosen by sophisticated parties to reflect their intent. Conversely, it rejected EMC's construction because it "has no basis in the plain language of the parties' agreements" (Op. at 15); is directly contradicted by § 2.05 of the SSA (*id.* at 9-10); is inconsistent with §§ 3.01(c) and 5.01(a) of the I&I Agreement (*id.* at 8-9); and because, if the parties had intended a default to be a requirement for repurchase, they "could have included such language" – but did not (*id.* at 9).

EMC either ignores or fails to persuasively challenge the multiple bases for the Court's conclusion.[10] Indeed, as to the Court's point that the parties could have added EMC's limiting requirement if it truly reflected the parties' intent, EMC attempts to turn the Court's

---

level warranties concerning the individual loans, thereby increasing the riskiness of those loans, "Syncora's overall risk of loss on the Policy increased." (Op. at 6.)

[10] EMC makes no mention of §§ 3.01(c) or 5.01(a) of the I&I Agreement. As to § 2.05 of the SSA, EMC argues that it does not support Syncora's interpretation because it applies when loans are being repurchased without an "adversely affects" requirement. (EMC Br. at 11.) Nothing precluded EMC from raising this argument before and it is improper to do so now. In any event, EMC is wrong. Section 2.05 applies when performing loans are being repurchased under several other sections of the SSA. Some of these sections do not have an "adverse effect" requirement, but some do. Specifically, Section 2.05 applies to performing loans put back under Section 2.02, which in turn states that the trustee must demand a substitute loan whenever a defect "materially and adversely affects" the Note Insurer's interests. This is why Section 2.05 was cited by Syncora, and the Court addressed and correctly decided this issue in its ruling. (*See* Order at 9-10.)

reasoning on its head.  EMC argues that it is "equally true" that "[t]he parties could have included language providing that Syncora may invoke the repurchase remedy whenever a breach increases the risk that a loan might default" (*i.e.*, Syncora's position).  (EMC Br. at 10.)  But there is no parity with respect to the parties' position.

Syncora's position reflects an interpretation of an existing term of the contract (*i.e.*, "interests of the Note Insurer") to include the risk of loss.  EMC's position – in stark contrast – would read into the contract a new limiting exclusion (*i.e.*, the "adverse effect" could be shown *only* by establishing a breach "caused" by a default).  (EMC Merits Br. at 3.)

Accordingly, the Court properly declined to add the limiting requirement proposed by EMC "'under the guise of interpreting the writing.'"  (Op. at 9 (quoting *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001)).)

The Court's reasoning is supported by established New York law.  When considering plain contract language that unambiguously supports one party's interpretation, courts routinely reject the other party's construction by noting that, if the parties had intended such a meaning, "they could easily have expressed this intent."  *Chock Full O'Nuts Corp. v. Tetley Inc.*, 94 Civ. 8262, 1997 U.S. Dist. LEXIS 11605, at *17 (S.D.N.Y. Aug. 8, 1997).  This is a particularly apt analysis where, as here, the parties chose broad, inclusive language, unaccompanied by limiting language.  *See Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (finding broad language unambiguous "as it is accompanied by no limiting language").  The Court properly rejected EMC's construction as unreasonable because it would read into the provision a limiting *exclusion* that is not there – *i.e.*, that it applies *only* to breaches that cause a loan to default.  Neither at oral argument nor on this motion does EMC even try to explain why, if the parties intended to limit repurchase to those

breaches "resulting in a loss to the trust" (EMC Merits Br. at 3), the parties did not simply so provide in the agreement, but instead chose the broad and inclusive phrase "adversely affects the interests of the Note Insurer."

The Court granted Syncora's requested ruling, both because the plain language of the repurchase provision, as well as the other related provisions in the parties' agreements, fully support Syncora's interpretation, **and** because EMC proffered an implausible construction that would require the Court to fundamentally alter significant contract language chosen by "sophisticated, counseled business people negotiating at arm's length." *Riverside South Planning Corp.*, 13 N.Y.2d at 363 (quoting *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004)). The Court properly did so. (Op. at 9.)

## II. The Extrinsic Evidence EMC Offers Is Irrelevant and Misleading.

### A. The extrinsic evidence is irrelevant.

In light of the Court's holding that Section 7 of the MLPA is susceptible to only one reasonable construction, EMC's insistence on the further use of extrinsic evidence – including evidence already provided to and discussed with the Court – is also improper. Because the Court correctly held that the contractual language is unambiguous, EMC's "new" extrinsic evidence (as well as its offer of future expert testimony) will not and cannot disturb the plain meaning accepted by the Court. *Retrofit Partners I, L.P. v. Lucas Indus.*, 201 F.3d 155, 161 (2d Cir. 2000) (stating that extrinsic evidence is irrelevant where contract is unambiguous). Nevertheless, Syncora will respond to the fundamentally misleading presentation of "evidence" offered by EMC in conjunction with this motion.

### B. EMC repeats evidence it already presented to the Court.

Reconsideration should not be requested on the basis of repeated arguments that were considered by the Court, *see Anglo Am. Ins. Group, P.L.C. v. Calfed Inc.*, 940 F. Supp. 554,

557 (S.D.N.Y. 1996), or on the basis of evidence available to the moving party during the initial briefing, *see United States v. Potamkin Cadillac Corp.*, 697 F.2d 491, 493 (2d Cir. 1983). Yet this is exactly what EMC does.

While explicitly acknowledging that a motion for reconsideration should not be used as an opportunity to rehash the same facts and arguments, EMC begins its discussion of the facts by revisiting evidence it has already submitted to the Court: specifically, the deposition testimony of a former Syncora employee (Christine Brunie) from another litigation, and the timing of Syncora's repurchase demands. (EMC Br. at 12.) Ms. Brunie's testimony was already discussed by both parties and by the Court; EMC addressed her testimony in its opposition brief (EMC Merits Br. at 19), Syncora responded (Syncora Reply Br. at 6 n.6), and the Court specifically asked counsel about her testimony at oral argument (Tr. at 26). EMC's assertion that the Court failed to take adequate notice of this testimony because the Court "did not reference or acknowledge this evidence in its opinion" (EMC Br. at 12) is therefore absurd. EMC's real complaint is that the Court did not agree with EMC that Ms. Brunie's testimony somehow alters the plain meaning of the contract.[11] The same can be said of the fact that Syncora did not make repurchase demands until a year after the transaction closed. Both sides addressed this point in their briefing, with Syncora explaining that it *did not have access to the loan files* until the Transaction started showing signs of poor performance, at which point Syncora demanded the files so that it could do its own reunderwriting. (Syncora Reply Br. at 6 n.6.)

---

[11] With respect to the merits of EMC's argument regarding this testimony, as Syncora already explained in its brief, and at oral argument, Ms. Brunie was not a 30(b)(6) witness, nor did she have responsibility for deciding which loans to put back to securitization sponsors, a point she made clear when testifying that she was "not an expert" regarding Syncora's repurchase rights and that those decisions were made by counsel. (Syncora Reply Br. at 6 n.6.)

C.  EMC's misleading reference to purportedly new extrinsic "evidence" does not support its position.

EMC also misleadingly asserts that reconsideration is warranted because it has uncovered new evidence that was not available at the time of the briefing on partial summary judgment. (EMC Br. at 3, 13.) But the majority of the proffered evidence was not "gathered" "since briefing on the motion was completed last December," as EMC asserts (*id.* at 3), and in any event, EMC misconstrues that evidence in a failed attempt to bolster its untenable interpretation.[12]

To start, EMC improperly implies the following information was not available to EMC when briefing was completed in the fall of 2011:

- An email from Mary Jane Constant, a Managing Director at Syncora, which was produced to EMC *on August 7, 2009*.

- Deposition testimony from Lynn Mesuk, who was deposed *on January 7, 2010*.

- The fact that the representations and warranties in the MLPA had not been finalized when Syncora's Credit Committee voted to approve the proposed transaction. The Credit Committee's voting sheet, which reflects that the committee approved the transaction on February 26, 2007, was produced *on August 7, 2009*.

- The fact that Syncora was provided with the results of EMC's due diligence on a portion of the loans prior to entering the transaction and what the due diligence showed. While Ms. Kobrin's testimony post-dates the summary judgment briefing, Syncora produced documents *on September 1, 2009*, showing its receipt of this due diligence. Thus, the facts were known by EMC long before the briefing on Syncora's summary judgment motion.

Moreover, straining to find any facts to support its untenable interpretation, EMC resorts to excerpting, de-contextualizing, and distorting the so-called evidence that it cites.

---

[12] EMC also does not bring to the Court's attention the vast evidentiary support for the Court's interpretation. (*See, e.g.*, Syncora Merits Br. at 13-16.)

First, EMC flagrantly mischaracterizes Ms. Constant's statements in alleging that her email supports EMC's argument that default is a precondition to repurchase. Despite the fact that the Court does not have the benefit of reviewing the actual e-mail, EMC self-servingly cites only one sentence in Ms. Constant's email – in which she states that "We can put-back any loan w/breach but have to show damages" – while omitting both the remainder of her e-mail and the entirety of the prior correspondence. The *entirety* of Ms. Constant's email, in which she responds to the question *"are putbacks limited to chargeoffs?"* reads as follows:

> We can put-back any loan w/breach but have to show damages. Damages can be measured as a decline in mkt value *so pre-charge off breach still affect MV* and obviously a default on the loan affects MV even more.

(Emphasis added.)[13] Read in its full and proper context, rather than support EMC's position, Ms. Constant's e-mail makes absolutely clear that Syncora's put-back rights are *not* limited to loans that have defaulted and been charged-off, and that a breaching performing loan adversely affects Syncora's interests.

Second, EMC offers deposition testimony from Lynn Mesuk – an Assistant General Counsel for JP Morgan and former Bear Stearns attorney, who EMC designated as a 30(b)(6) witness. What EMC fails to note, and as Ms. Mesuk's counsel explicitly stated in connection with these issues, is that as a 30(b)(6) witness, Ms. Mesuk was articulating *EMC's position* with respect to the interpretation of the repurchase provision. (Mesuk Tr. 160:10-20.) Her testimony is therefore hardly surprising; indeed, it would have been shocking if a lawyer for EMC's parent company testified as a 30(b)(6) witness that EMC's litigation position was wrong.

Similarly, EMC cites the testimony of Susan Davia, a former GreenPoint Vice President, as supporting its claim that the repurchase provision does not require repurchase of a loan that "defaults for reasons other than the breach." (EMC Br. at 13.) EMC fails to disclose

---

[13] Should the Court wish to review Ms. Constant's e-mail, Syncora will provide it.

- 13 -

that, as a former GreenPoint employee represented by GreenPoint's counsel, Ms. Davia is far from an impartial witness. Indeed, GreenPoint's corporate representative testified that EMC and GreenPoint are cooperating in this matter and GreenPoint "want[s] EMC to win." (GreenPoint 30(b)(6) Tr. 558:10-559:16.) Moreover, Ms. Davia's testimony was far more equivocal than EMC suggests. She merely testified that "[i]n order for a repurchase to occur . . . the loan has to be materially and adversely affected in its value." (Davia Tr. 218:8-10.) That answer does nothing more than paraphrase common language in repurchase provisions.[14] It certainly does not support EMC's position that Syncora's interests in a loan can only be adversely affected by a default.

Finally, EMC provides misleading summaries of testimony from two Syncora employees. EMC cites first to the testimony of Linda Kobrin, a Managing Director at Syncora, to claim that, because Syncora was aware that a percentage of loans in a due diligence sample were removed from the pool because they were found to have defects, the parties must have contemplated that any similar defects in the remainder of the pool would not be subject to repurchase unless the breach had an "actual effect . . . on loan performance." (EMC Br. at 13-14). What EMC omits, however, is that Ms. Kobrin testified that her concern that other loans in the pool might have been defective *is one of the reasons why Syncora obtained the representations and warranties*. (Kobrin Tr. 458:2-459:8.) Thus, the cited testimony by Ms.

---

[14] Moreover, Ms. Davia was not even testifying about the repurchase provision at issue in this case. She was testifying about a separate repurchase protocol in a contract between EMC and GreenPoint, to which neither Syncora (nor any other insurer) was a party. Thus, her testimony said nothing about whether an *insurer's interests* can be adversely affected by an increase in risk. As the Court recognized in rejecting EMC's citation to *LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.*, No. 01 Civ. 4389, 2002 WL 181703 (S.D.N.Y. Feb. 5, 2002), Syncora has "legally distinct interests," as reflected by the fact that the "repurchase obligation is triggered when a breach of a representation or warranty 'adversely affects the interests of the Note Insurer.'" (Op. at 14 (quoting MLPA § 7).)

Kobrin does nothing at all to support EMC's contention that increased risk at the time of closing does not constitute an "adverse effect" on Syncora's interests under the repurchase provision.[15]

## CONCLUSION

For the reasons stated above, EMC offers no legitimate basis for reconsideration of this Court's Opinion, and EMC's arguments are, in any event, entirely without merit.

Dated: July 25, 2012
       New York, New York

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

By: _____
       Philip R. Forlenza
       Erik Haas
       Matthew J. Shepherd
       A. Leah Vickers
       Anthony C. DeCinque
       Jason R. Vitullo

*Attorneys for Plaintiff Syncora Guarantee Inc.*

---

[15] Finally, EMC cites the testimony of Cassie Lau, a Senior Managing Director at Syncora, to confusingly suggest that because Syncora "made the decision" to participate in the transaction before the governing agreements were finalized, the interests at issue in the repurchase remedy of the MLPA must be Syncora's post-closing interest in loan performance. (EMC Br. at 14.) Again, as detailed above, Syncora's interest in risk is not simply a "pre-contractual" interest, as Syncora was adversely affected on the closing date by assuming the risk on loans that were riskier than they were warranted to be. Nothing in the fact that the specific contractual warranties were not finalized before Syncora's credit committee approved the Transaction in any way supports EMC's argument that Syncora's interests were limited to the performance of the loans post-closing.