C6D9SYNA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SYNCORA GUARANTEE INC.,

4                   Plaintiff,

5            v.                              09 CV 3106 (PAC)

6   EMC MORTGAGE CORPORATION,

7                   Defendant.

8   ------------------------------x
                                        New York, N.Y.
9                                       June 13, 2012
                                        2:43 p.m.
10
    Before:
11
                        HON. PAUL A. CROTTY
12
                                            District Judge
13
                              APPEARANCES
14
    PATTERSON, BELKNAP, WEBB & TYLER LLP
15       Attorneys for Plaintiff
    BY:  PHILIP RUSSELL FORLENZA
16          ERIK HAAS
            ANTHONY CHRISTOPHER DeCINQUE
17          JASON ROBERT VITULLO

18   SULLIVAN AND CROMWELL, LLP
         Attorneys for Defendant
19   BY:  ROBERT A. SACKS
            DARELL SCOTT CAFASSO
20
     GREENBERG TRAURIG, LLP
21       Attorneys for Defendant
     BY:  ERIC NEVINS WHITNEY
22          ANASTASIA ANGELOVA ANGELOVA

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

C6D9SYNA

```
 1              (In open court; case called)
 2              THE COURT:  Are you going to be arguing today,
 3   Mr. Forlenza?
 4              MR. FORLENZA:  I am, your Honor.
 5              THE COURT:  And Mr. Sacks?
 6              MR. SACKS:  Yes, your Honor.
 7              THE COURT:  How much time do you need, Mr. Forlenza?
 8              MR. FORLENZA:  Well we have two points, Judge.  I
 9   would think altogether 30 minutes or so, maybe 40 at the most.
10              THE COURT:  Not 40.
11              Mr. Sacks, how about you?
12              MR. SACKS:  Depends on what Mr. Forlenza says, your
13   Honor.  So it's hard for me to estimate.  But I'll be guided by
14   your judgment as to how much you want to hear and don't want to
15   hear.
16              THE COURT:  All right.  Mr. Forlenza, go ahead.
17              MR. FORLENZA:  Thank you very much, your Honor.
18              Judge, there are two different issues.
19              The first is the repurchase protocols construction;
20   and the second is the availability of rescissory damages for a
21   material breach.
22              Would you prefer that when I finish the first point
23   you hear from Mr. Sacks so there's some continuity?
24              THE COURT:  I think that would be best, yes.
25              MR. FORLENZA:  Okay.  I'll do that.
```

C6D9SYNA

1                THE COURT:  Is that all right with you, Mr. Sacks?

2                MR. SACKS:  It is, your Honor, yes.

3                MR. FORLENZA:  Thank you, Judge.

4                Your Honor will recall that early on in the case you

5     asked counsel to come up with some ways of trying to allow this

6     Court to efficiently try this case in which the plaintiff is

7     alleging that over 8,000 loans are defective because of

8     warranty breaches.  And we came up with a few legal issues that

9     we thought would accomplish that.

10               We identified the first one.  And you ruled on that

11    last year when you held in March that the repurchase protocol

12    in the MLPA was not the exclusive remedy for Syncora for

13    breaches of representations and warranties.

14               The two declarations we seek today, Judge, will avoid

15    the necessity of having to engage in hundreds, thousands of

16    mini trials to enable Syncora to prove its two main claims.

17               First, the damage claim for the total frustration by

18    EMC of the repurchase protocol; and the second, a monetary

19    award in the form of rescissory damages for the material breach

20    of the I&I.

21               So let me start with the repurchase protocol.

22               The issue before the court is, on this, is when and

23    how are EMC's obligations under the repurchase protocol

24    triggered, that is to say, its obligations to cure, repurchase,

25    or replace defective loans.

C6D9SYNA

```
1              The ruling we seek is that those obligations are
2    triggered at the time of the warranty breach which -- or let me
3    state it differently.
4              The obligations are triggered at the time the loans
5    that were warrantied are breached in a way that increases the
6    risk of those loans.
7              Now the time of breach is at the closing because these
8    warranties are related to the risk attributes of the loans, and
9    those are warranties of fact existing at the time of closing.
10   So if, in fact, at the time of closing the breaches -- sorry,
11   the facts are not as represented and warranted, that's when the
12   breach is complete.
13             The warranties, because they cover the risk
14   attributes, in order to trigger the obligations to cure,
15   replace, repurchase, have to be a breach that causes the loan
16   to be become riskier.
17             THE COURT:  You're using an insurance analogy,
18   correct?  You know, you have to judge the risk at the time of
19   the closing?
20             MR. FORLENZA:  Absolutely, your Honor.
21             THE COURT:  What do you say then of Mr. Sacks'
22   position that you need something more than that?
23             MR. FORLENZA:  Well, EMC doesn't challenge the fact
24   that the breach is complete at the time of the closing.  It
25   says that -- I think it's a rather extraordinary proposition,
```

C6D9SYNA

1    particularly when you look at the purpose and the language of

2    the protocol.

3                EMC takes the position that upon the discovery --

4    let's say the day after the closing -- of a breach that is

5    egregious, a breach which dramatically increases the risk

6    profile of the loan -- the borrower has fabricated income by a

7    multiple of ten -- that although that loan is clearly

8    defective, they have no obligation to even cure it, let alone

9    replace it or repurchase it, until you wait for two things to

10   happen which could take a long time:  One that it actually

11   defaults; and two, that you establish that the breach was the

12   cause of the default.

13               And we take the position, your Honor, that when you

14   take the plain meaning of the words used by the parties, you

15   simply cannot justify that construction.  Let me tell you --

16               THE COURT:  The plain meaning is set in the MLPA and

17   the I&I.

18               MR. FORLENZA:  Well, yes.

19               Yes.  The repurchase protocol is in the MLPA,

20   incorporated into the I&I.

21               Can I hand up that language to your Honor?

22               THE COURT:  No.  Just tell me where it is.

23               MR. FORLENZA:  Section seven.

24               Do you need me to cite to you the brief, your Honor,

25   or the exhibit?  I'm not sure I can at the moment.

C6D9SYNA

1          Page seven of our opening brief.

2          THE COURT:  Okay.

3          MR. FORLENZA:  What you'll see, your Honor -- sorry.

4    Let me let you get there.

5          MR. SACKS:  Your Honor, Exhibit 3 of Mr. Forlenza's

6    declaration is the MLPA.  That I believe has not been --

7    section seven.

8          THE COURT:  Thank you, Mr. Sacks.

9          MR. FORLENZA:  I would add, your Honor, this is not

10   just insurance law but it is basic warranty law in general,

11   contract warranty law.

12         So the question, your Honor, is what is the plain

13   meaning of the words used.  And if you look at the first

14   paragraph and it begins "upon discovery or receipt of notice,"

15   do you see that, Judge?

16         THE COURT:  You're in section seven?

17         MR. FORLENZA:  Yes, your Honor.  I've actually

18   highlighted it -- are you sure you don't want me to show you

19   this?

20         THE COURT:  I've got a highlighted version myself.  I

21   wonder if we have the same highlights.

22         MR. FORLENZA:  So what you'll see, Judge, is that

23   there are two triggers for the remedial obligation of EMC.

24         First, there's got to be a breach of a rep or a

25   warranty.  Then the first trigger is:  Which materially and

C6D9SYNA

1     adversely affects the value of the interests of the purchaser,

2     noteholders, indentured trustees, or the note insured in any of

3     the HELOCs.  And then the second trigger, alternatively:  Or

4     which adversely affects the interests of the note insurer.  So

5     the language that's common to both of these, which is the

6     language in issue, is -- it's in the second trigger exclusively

7     in the sense there are no other words:  A breach which

8     adversely affects the interests of the note insurer.

9             Now, your Honor, the plain meaning of that word

10    "interest," particularly in the context of an insurer, is

11    inclusive.  It's broad.  That is to say, it is not restrictive.

12            They take the position that the insurer has no

13    interest in the credit quality, in the accuracy of

14    representations and warranties regarding risk attributes of the

15    collateral that is the sole source of the funds for their

16    insurance obligation.

17            I think that is an utterly unreasonable position.

18            After all, Judge, as we point out in our brief, risk

19    is the business of insurers.  It's the thing that they are in

20    business for:  Managing risk, evaluating risk.  How do they do

21    that?  They do it by warranties.

22            And a note insurer in an asset-backed security, Judge,

23    its vital interest is in the risk attributes of the underlying

24    collateral.  That's why it got, in this case, 71 warranties

25    regarding those risk attributes.

C6D9SYNA

1         So to say that the note insurers' interests are not

2    affected when a loan is not as represented but is, let's say

3    dramatically more risky, I think is to distort the meaning of

4    the word interest.

5         But there's another point, Judge.  As your Honor is

6    aware, the courts often will take a party's proposed

7    interpretation of construction and reject it by looking at the

8    words used and then reach a conclusion that if the parties

9    intended that construction, they would have used the words

10   reflecting it.

11        Judge Leisure did it in the case Chockful of Nuts in

12   the Second Circuit and New York Court of Appeals in Riverside

13   South.

14        In this case, typically the Court has to come up with

15   those words.  The Court says look if the parties really

16   intended X, they could have used these words.

17        Here EMC has made it easy for us.  EMC itself

18   identifies in its brief the very words that the parties would,

19   could, and should have used to reflect their construction.

20        Their construction is -- and it's laid out at page

21   three of the brief, which I'll read into the record.  They say

22   as follow unequivocally, Judge.  Page three of their brief they

23   say, "Unless and until the loan becomes delinquent, defaults or

24   is otherwise unable to generate its scheduled payments, thereby

25   resulting in a loss to the trust, Syncora's interest cannot be

C6D9SYNA

1    adversely affected."

2              In other words, Judge, what they're saying is that the

3    way you should read the repurchase provision is along these

4    lines.  And I'll paraphrase but using exactly their words.

5    That repurchase is required upon discovery or notification of a

6    breach when, as a result of a breach of the loan, quote -- this

7    is their words -- becomes delinquent, defaults or is otherwise

8    unable to generate a scheduled payment, thereby resulting in a

9    loss to the trust.

10             They want to replace the words "adversely affects the

11   interest" with the phrase "thereby resulting in a loss to the

12   trust."

13             Judge, try to imagine the meaning --

14             THE COURT:  The words that you're quoting there and

15   positing that they want in the contract are obviously not there

16   in the contract.

17             MR. FORLENZA:  Exactly.  Exactly.

18             What I'm saying -- ask your Honor to do is try to

19   imagine, Judge, a meeting of Bear Stearns and EMC executives

20   with their securitization counsel coming up with the language

21   in the contract.  And the first thing they do is they decide

22   there's going to be one single event, one type of breach that

23   triggers EMC's obligations.  And that's going to be a breach

24   resulting in a loss to the trust.

25             Now imagine that group deciding how to articulate

C6D9SYNA

1  that.  And instead of putting in the brief -- sorry, into the

2  clause "a breach which results in a loss to the trust," they

3  say no, no.  It would be far better and clearer to come up with

4  the phrase "adversely affects the interests of the note

5  insurer."

6        It's preposterous.  It's a litigation construct.

7        It makes no sense that these parties, if this is what

8  they meant, wouldn't have used the precise words that convey

9  that message.  Because, as I say, they use "interest of a note

10  insurer" which is all about risk.

11        There is no rational explanation for using "adversely

12  affects the interest" instead of resulting in a loss to the

13  trust.

14        The words that litigation counsel came up with could

15  easily have been used by their corporate counsel, if it was

16  truly the intent.

17        I say to your Honor you don't have to look past the

18  language that they could have used because that shows that

19  that's not the parties' intent.  And it certainly shows it when

20  you give the word interest and interest of a note insurer its

21  plain meaning.

22        There's a second basis, Judge.

23        You pointed out in your earlier opinion that the Court

24  can and should, in construing the contract, consider other

25  provisions that are relevant in other related contracts.  And

C6D9SYNA

1      we have that in this case.

2                The sale and service agreement has a section 2.05.

3      And 2.05 completely contradicts their core position, the

4      predicate, that the repurchase protocol does not contemplate

5      the repurchase, cure or replacement of defective loans that are

6      still performing.  You've got to wait until they default.

7                And section 2.05, which I'm not sure we've quoted in

8      full and I really would like to hand up one demonstrative, your

9      Honor.  I think it would be very helpful.  May I do that?

10               THE COURT:  Yes.

11               MR. FORLENZA:  2.05 and the treasury regs, please.

12               Now you'll see Judge, again, I've highlighted.

13     Section 2.05 of the SSA makes explicit reference to the

14     repurchase provision in the MLPA as well as a repurchase

15     provision in the SSA.  And it addresses a situation that EMC

16     posits doesn't happen.  It addresses a situation, and I

17     boldfaced it, with respect to any --

18               THE COURT:  I highlighted mine.

19               MR. FORLENZA:  We're on the same wavelength.

20               It addresses a situation where a HELOC is not in

21     default or as to which default is not reasonably foreseeable;

22     in other words, a defective obligation that's still performing,

23     a defective mortgage still performing.

24               And 2.05 says you can replace or repurchase such a

25     loan but only if it's accompanied by an opinion of counsel that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C6D9SYNA

1    replacing a defective performing loan does not have adverse tax

2    consequences.  And there are tax regulations that address that.

3    Congress didn't want the REMIC to be able to -- shuffle loans

4    in and out of a REMIC.

5            So the repurchase -- sorry, the tax regulations

6    provide that performing defective loans can be replaced or

7    repurchased without adverse tax consequences if they meet the

8    definition of, quote, defective obligation.

9            Now, EMC says well 2.05 has nothing to do with this

10   situation because the regulations, they only address

11   extraordinary or exceptional circumstances.  And then they say,

12   quote, which here have nothing to do with EMC's put backs.  But

13   when you look at the regulation you see it has everything to do

14   with the put backs.  Why is that?

15           If you look at the bottom, your Honor.

16           THE COURT:  Yes.

17           MR. FORLENZA:  Treasury regulations.  They define a

18   defective obligation in one of two ways or one of two

19   categories.

20           A defective obligation is a mortgage subject to any of

21   the following defects.  And the first one is the defaulting

22   loan.  If it's a loan that's in default or likely to default,

23   it's defective.

24           But then they categorize three different ways in which

25   a performing loan meets the definition of a defective

C6D9SYNA

1    obligation.  And as you see (iv) it's a mortgage that does not

2    conform to a customary representation or warranty given by the

3    sponsor or the prior owner of the mortgage regarding the

4    characteristics of the mortgage.

5            Judge, every one of our put backs meets that

6    definition.  They're all put back because they breach the

7    warranties of EMC.

8            And EMC has never suggested that their warranties

9    aren't customary.  And if they ever did, you could take

10   judicial notice from the scores of litigation of RMBS that they

11   are customary.  So 2.05 clearly contradicts their position.

12           Now let me turn very briefly, Judge, to the purpose of

13   the protocol.

14           THE COURT:  Are you coming to a close now?  I want to

15   hear from Mr. Sacks.

16           MR. FORLENZA:  Very quickly.

17           Your Honor described the repurchase protocol in your

18   earlier decision as follows.  You said it was a low powered

19   sanction for bad mortgages that slipped through the cracks and

20   a narrow remedy, etc., etc.

21           The point we make, Judge, is that when you look at the

22   words and the purpose of that protocol, it's a classic example

23   or provision dealing with the seller of a warranted product.

24   If it's defective, you fix it, you replace it, or you

25   repurchase it.  That's the purpose of it.  It's got provisions

C6D9SYNA

1    of prompt notice.  It's got a 90-day provision for fixing or

2    replacing.  It anticipates and facilitates early resolution,

3    hopefully so you can avoid a loss occurring.  You cure it

4    before that.

5           But their position is you can never use the repurchase

6    protocol to avoid a loss because loss is a condition precedent

7    to any obligation, which makes no sense whatsoever.  If you

8    take their construction under the repurchase protocol, there is

9    no obligation for prompt notice.  It could be years later.

10   There is no exchange of information to try to resolve it

11   amicably because you've got to wait until it defaults and then

12   get into a dispute, usually through litigation, to resolve it.

13   There is no ability to avoid a loss.  You've got to wait for

14   the loss and then fight over what caused it.

15          Their construction puts this repurchase protocol on

16   its head.  It simply makes no sense.

17          Thank you.

18          THE COURT:  Thank you.

19          Mr. Sacks.

20          MR. SACKS:  Your Honor, I too have a couple of

21   demonstratives.  The one I'm going to refer to on this

22   particular issue is in the middle of this packet, if I could

23   hand it up to you.

24          THE COURT:  Yes.

25          MR. SACKS:  I will try to be relatively brief, your

C6D9SYNA

1    Honor, but there are a couple of points that I think I do need

2    to cover.

3           Mr. Forlenza has made a very nice argument, but it

4    violates -- we're on summary judgment.  It's his argument as to

5    how this clause should be construed.  The are clearly multiple

6    different interpretations of this clause that cannot be decided

7    as a matter of law in his favor.

8           While I suggest he is clearly wrong and that you might

9    be able to decide it against him, clearly you do not have the

10   ability on a motion for summary judgment to decide that this

11   clause should be construed in his favor because there are

12   countervailing interpretations, which are reasonable, and the

13   evidence presented on this motion does not preclude our

14   interpretation.  Indeed, I suggest it supports our

15   interpretation.

16          A couple of points.  First of all, unlike --

17          THE COURT:  Your point, Mr. Sacks, is that the

18   language of the MLPA and the I&I and the sales and service

19   agreement is ambiguous?

20          MR. SACKS:  Correct, your Honor.

21          THE COURT:  We should take parol evidence on it?

22          MR. SACKS:  At best it's ambiguous, your Honor.  At

23   best.

24          I think you could -- I personally think that you

25   could, in context, conclude that it is compelling evidence of

C6D9SYNA

1    our interpretation of the words.  But at best it's ambiguous.

2    And I think that on a motion for summary judgment -- at this

3    point we have not moved for summary judgment.  While I think

4    you could make a determination against Mr. Forlenza as a matter

5    of law, the easiest thing to do is leave this for trial to hear

6    what the parties' conflicting interpretations are.

7         THE COURT:  And a jury of twelve would be able to

8    parse this issue?

9         MR. SACKS:  I actually think it's your Honor in this

10   particular case.  It's not a jury trial.

11        So your Honor will have to do it.  And in terms of

12   parsing it, I don't think it's a very complex issue.  It's a

13   straightforward contractual interpretation issue.  And I would

14   like to show you the reasons why.

15        THE COURT:  Go ahead.  I'd like to hear them.

16        MR. SACKS:  First of all, your Honor, let me just say

17   one thing, because Mr. Forlenza says it time and time again as

18   though these rulings are going to assist you in avoiding a

19   trial or a complex trial.

20        We are not going to have tons of mini-trials on

21   individual loans.  We got you loud and clear on that.  And this

22   case, no matter whether his interpretation is correct or our

23   interpretation is correct, can be tried in an effective,

24   efficient way, the way sophisticated lawyers try sophisticated

25   business trials.  That's not what this motion is about.

C6D9SYNA

1              This motion involves a claim in which they are seeking

2     legal damages.  Not equitable relief.  But they are seeking

3     damages in this particular case.  They're seeking damages under

4     the repurchase protocol here.

5              To prevail on a damages claim for breach of contract

6     they have to show we had an obligation to repurchase, that we

7     breached the repurchase obligation, and they suffered damages

8     as a result of it.

9              Damages are economic harm; i.e., they lost money as a

10    result of our breach of contract.  That's the context in which

11    this repurchase protocol claim comes to the Court.

12             The obligation to repurchase under the plain language

13    of the contract consists of two things:  First, a breach of a

14    representation and warranty; and second, a separate requirement

15    and collective requirement which is that the breach adversely

16    affected the interests of Syncora.

17             They point to language.  They point to purpose.  They

18    point to case law.  And they point to extrinsic evidence.  All

19    four of those favor our interpretation under this.

20             First of all, Mr. Forlenza has talked about an

21    insurer's interest in the abstract.  We're talking about the

22    insurer's interest as it was meant to be referenced under the

23    terms of this contract.  Insurers can have many different

24    interests.  They can have interest in risks.  They can have

25    interest in insurability.  They can have interest in whether

C6D9SYNA

```
1    legislation is passed.  But we're talking about their interest

2    in this transaction.  That's what -- this clause is a provision

3    of the transaction.  What is their interest in this transaction

4    that is going to be adversely affected?

5              The interest in this transaction, given their role, is

6    solely that the HELOCs generate enough cash flows to cover the

7    obligations to investors so they don't ever have to pay.  Their

8    interest is in the cash flows that the loans generate.

9              Syncora doesn't own the loans in this case.  It's not

10   entitled to payments from the loans in this case.  It was paid

11   a premium up front.  All it cares about is the cash flows.

12   It's only interest in this transaction is in the cash flows

13   from the HELOCs in this case.

14             Now, what's an adverse effect?

15             So that's --

16             THE COURT:  Why do they rely then on representations

17   and warranties?  Why did you provide the representations and

18   warranties?  You should just have given them a cash flow chart.

19             MR. SACKS:  Because those representations and

20   warranties could affect the cash flows.  Those representations

21   and warranties, there could be a breach of a representation and

22   warranty that could cause a loan to default.

23             THE COURT:  What if they turn out, Mr. Sacks, to be

24   wholly inaccurate?  The representations and warranties?

25             MR. SACKS:  As to all ten thousand loans?
```

C6D9SYNA

1          THE COURT:  Well, say a thousand loans.

2          MR. SACKS:  That's -- well, your Honor, that's

3  interesting you say that because I have testimony which I

4  could -- I can hand up to your Honor -- it was taken after this

5  motion was filed in this case -- where their witness testified

6  that she was aware that seven percent of the -- based on the

7  due diligence that was done, that seven percent of the loans in

8  this case might breach the representations and warranties.

9  That's seven hundred loans.

10          THE COURT:  That's the stress test?

11          MR. SACKS:  No.  That's not the stress test.

12          The diligence that they did before entering into --

13  that we did, and they reviewed before entering into this

14  transaction demonstrated that seven percent of the loans that

15  went into the transaction, if they were representative of what

16  was looked at in due diligence, might breach representations

17  and warranties.

18          The parties -- this is why this is not a summary

19  judgment issue, your Honor.  That's why the parties

20  understood -- these are sophisticated parties.  This is a

21  provision that was intended to effect, if a loan defaulted or

22  if a loan somehow for another reason we posited in our brief

23  usury, your Honor, if something happened that caused the cash

24  flows to be affected because of a loan in breach of a

25  representation and warranty and they gave us notice, we have an

C6D9SYNA

1    obligation to repurchase.

2            But there is a requirement here of adverse effect.

3    It's the second element.  It's not just breach.

4            And, remember, this claim, your Honor, is not their

5    claim for equitable relief which we're going to get to in a

6    minute.

7            THE COURT:  Yes.

8            MR. SACKS:  This is a claim under the repurchase

9    protocol for damages, legal damages.  Not equitable relief.

10           So, they need to meet the requirements of the

11   repurchase protocol.  The second element is an adverse effect

12   on their interest.

13           You don't need a theoretical or hypothetical or

14   potential adverse effect.  But it's an actual adverse effect.

15           They want it to say:  That may adversely affect its

16   interests in this transaction.  It may affect it.  Could have

17   an impact on it.

18           Because risk of loss isn't actual loss.  There are no

19   damages if a loan has a higher risk of loss but it doesn't

20   default and does exactly what it was supposed to do.

21           Remember, this is the damage claim.  This is not an

22   equitable relief claim.

23            So they have to show they suffered pecuniary loss as

24   a result of the breach.  And so it has to have --

25           THE COURT:  What about that string of cases in the

C6D9SYNA

1    New York Court of Appeals going back to Judge Desmond in 1943,

2    if somebody fails to disclose that they have a -- I don't know

3    whether it was --

4              MR. SACKS:  A medical condition.

5              THE COURT:  A medical condition.  It was an ulcer.

6    And then the person died of a heart condition.  And they said,

7    recognized the two are not related.

8              MR. SACKS:  Understood.

9              THE COURT:  The ulcer condition had nothing to do with

10   the coronary condition, but it affected risk.  Therefore, we're

11   going to deny coverage.

12             MR. SACKS:  We'll get to that, your Honor.  But that's

13   a different claim.  That's Mr. Forlenza's issue number two.

14   This is issue number one.

15             Let's keep in context this claim.  This is a claim

16   for -- this is not a rescission claim.  This is a claim for

17   monetary damages under the terms of the repurchase protocol in

18   the contract.  They want to enforce the repurchase protocol.

19   They're not seeking rescission on this claim.  They're

20   seeking -- you violated --

21             THE COURT:  They can't seek rescission, can they?

22             MR. SACKS:  They cannot.  And we're going to get to

23   that in another minute, your Honor.

24             THE COURT:  As I understand it, they're seeking the

25   equitable equivalent.

C6D9SYNA

1          MR. SACKS:  They are.  We're going to get to what as

2     well, your Honor.

3          THE COURT:  I'll wait then.

4          MR. SACKS:  Again, I would like -- and I know there's

5     a risk of this, the risk of the issues getting confused.

6     That's why I think it's important to remember this is a claim

7     that's in their complaint, and it's for monetary damages, not

8     equitable relief, under the terms of the repurchase protocol.

9     And so they must enforce the repurchase protocol in accordance

10    with its terms.  And those terms are, at best, ambiguous and

11    they cannot be construed in the way they want on a motion for

12    summary judgment.

13          So let me go back to adverse because adverse does not,

14    as a matter of law mean, as they suggest it does, with no

15    countervailing reasonable construction that it could in theory

16    affect their risk of loss.  Because a theoretical effect on a

17    risk of loss is not something that leads to damages.

18          They could have said, and we cited to your Honor,

19    there are clauses and cases they've relied upon that don't have

20    the second requirement that there be an adverse effect.  So

21    that could have not been in the contract.  Or they could have

22    said may have an adverse effect.  Or in the Ravens case we

23    cited to your Honor said is reasonably likely to have an

24    adverse effect or something of that sort.  But it doesn't say

25    that.  It must have an actual adverse effect on the interest.

C6D9SYNA

1          That construction, your Honor -- if you don't want to

2   accept it now, that's fine.  But you can't say it is an

3   unreasonable and untenable construction as a matter of law on a

4   summary judgment motion.  They have offered no evidence to

5   suggest that that's not a reasonable construction.

6          In fact, it is the right construction.  But if we have

7   to present evidence on it, we'll present evidence at trial as

8   to the purpose and intent of these type of clauses and why, in

9   fact, that's the right construction of this, and why you only

10  repurchase things that have an economic effect but not things

11  that might in theory have an economic effect.  If that's

12  necessary.

13         But you can't reject that on a motion for summary

14  judgment which is what they're suggesting your Honor do.

15  Again, it has to be something that their construction is the

16  only possible construction as a matter of law.

17         Their construction would read adverse effect out of

18  this agreement and say if you have a material breach of a rep

19  and warranty because those affect our insurable interests, then

20  you've breached this.  There is no need for an adverse effect.

21  There is de facto an adverse effect upon a breach of a rep and

22  warranty.

23         That's not what this clause says.  There are two

24  requirements:  Breach, adverse effect.  They want it to be read

25  out of this contract.

C6D9SYNA

1              The obligation -- and it makes sense in this context.

2      Because the obligation to repurchase doesn't arise until there

3      has been an actual adverse effect which is when the clause is

4      triggered by giving notice.  You don't give notice, again, in a

5      vacuum.  You give notice when something happens that affects

6      you.

7              The purpose of this clause.  Your Honor, you can look

8      at this, again, if -- it is to protect them from the economic

9      harm that would affect the interest that they assumed in this

10     contract.

11             Further, your Honor, if you look at what I've handed

12     up to you --

13             THE COURT:  I was waiting for that.

14             MR. SACKS:  They rely on extrinsic evidence.

15             The housing market is going to be referenced later.

16             But if you look, your Honor, at the third page.

17             THE COURT:  Okay.

18             MR. SACKS:  Their own witness has testified to a

19     construction that is the construction we say.  Their own

20     witness, this person who is their head of surveillance, the

21     person who is responsible for overseeing the performance of the

22     loans in their trust.  She's testified as saying that if you

23     have a loan that was an exception to an underwriting guideline

24     and you never suffered a loss associated with that loan, you

25     then do not have the right to --

 1              THE COURT:  I guess she wasn't prepared for

 2    Mr. Forlenza.

 3              MR. SACKS:  Perhaps that's the case, your Honor.  But,

 4    again, we're here on summary judgment in the face of testimony

 5    from the person who is their witness, who is their head of

 6    surveillance that endorses our construction of this contract.

 7    How can you grant summary judgment on their interpretation?  It

 8    doesn't make sense.  This is not a summary judgment point for

 9    them, your Honor.

10              I can go into the cases if that's necessary.  I can go

11    into other points if your Honor --

12              THE COURT:  What's your best case, Mr. Sacks?

13              MR. SACKS:  Our best case on this point -- I don't

14    know that there is a best case.  I would say LaSalle v. CIBC.

15    LaSalle v. Citicorp.  And, indeed in a case that they like for

16    another purpose, and though I wouldn't like to tout Justice

17    Bransten's rulings generally, she found that a similar clause

18    was subject to disputes and was not susceptible to

19    interpretation on summary judgment in their case six months

20    ago.

21              THE COURT:  All right.  Thank you very much.

22              MR. FORLENZA:  May I have one minute, Judge?

23              THE COURT:  One minute for reply.  And then we have to

24    go into the rescission area.

25              MR. FORLENZA:  Precisely.  Very quickly, Judge.

C6D9SYNA

1              We're not talking about potential risk -- sorry

2     potential adverse effect.  When a loan is riskier than

3     warranted, there's an actual adverse effect.  That's the

4     reason, as you pointed out, we got the warranties.  If there

5     are 71 warranties saying the risk attributes are X, the

6     insurance company makes a decision to submit itself to six

7     hundred million dollars of exposure for a million dollar

8     premium, and it turns out that these warranties are all

9     incorrect or worthless in terms of accuracy.  To suggest that

10    an insurance company is not adversely affected by that I think

11    makes no sense whatsoever.

12             THE COURT:  What about Ms. Brunie's statement?

13             MR. FORLENZA:  First of all, she's not a 30(b)(6)

14    witness.

15             THE COURT:  Isn't she a managing director?

16             MR. FORLENZA:  Yes, but she testified she had no

17    responsibility for making these decisions.  It was counsel's

18    decision.  In other words, she was not the person who had

19    knowledge of this.  She gave an opinion about what she didn't

20    have any real knowledge.  And we made that point in footnote

21    six of our reply brief.

22             Finally, I want to make this very important point

23    about damages.  Because there's a real symmetry, your Honor,

24    between the language and purpose of the protocol and the remedy

25    in the protocol.  It says when the adverse -- when the breach

C6D9SYNA

1   adversely affects the interest, you cure, replace, or

2   repurchase.  That's not a damage claim.

3           We're asserting that there was an utter frustration of

4   the repurchase protocol.  Had it been lived up to, it provides

5   in the protocol that the repurchase price is the outstanding

6   principal.  So we did a model based on what would have been

7   paid.

8           But I want to say that again.  The adverse effect

9   simply triggers the remedy of cure, replace, repurchase.

10          It's a pure question of law.  And those two cases I

11  cited Judge, we'll send you the citations in our brief.

12          THE COURT:  What about rescission now?

13          MR. FORLENZA:  Okay, Judge.

14          Give me one second, please.

15          This I can do shortly, Judge.

16          The issue here is whether Syncora is entitled to the

17  monetary equivalent of rescission where we establish there are

18  massive breaches of warranties on this big exposure, that

19  Syncora would ordinarily be entitled to rescission for a

20  material breach, which would put it back in the position that

21  it would have been in had it not issued the policy.  But they

22  issued an irrevocable policy having relied on these warranties

23  because, after all, the noteholders are innocent and have no

24  relation to anything --

25          THE COURT:  Let me ask you, Mr. Forlenza.  I know that

C6D9SYNA

1    Mr. Sacks won't agree with this.  But say you prevail on the

2    first issue, why do you need rescission then?

3              MR. FORLENZA:  Well, Judge, at some point we're going

4    to have to elect remedies.  And I'm not sure where that point

5    is.  We're looking into that.  But there are two ways of

6    getting to, you know, pretty much the same result.

7              THE COURT:  What do you say if Mr. Sacks has not

8    convinced me in the first argument and you're entitled to

9    summary judgment, but here on rescission you haven't convinced

10   me that you're entitled to rescission or the equitable

11   equivalent of rescission?

12             MR. FORLENZA:  Assuming I haven't, then your question

13   is what, Judge?

14             THE COURT:  The question is if you have one what do

15   you need the other one for?

16             MR. FORLENZA:  Well because all we're asking for on

17   the first one is a ruling as to what their obligations are and

18   how -- and that they've breached them by not taking them back.

19             We then have to prove, with every loan -- well with a

20   sample that, in fact, there was a material breach.  In other

21   words, we're not asking for rulings that, you know, in fact,

22   they have breached.  We're just saying what's the legal

23   standard.

24             We're going to have to prove that.  And we're going to

25   have to do a damage model that your Honor accepts.  So it's

C6D9SYNA

1   crucially important that we have both because we have no

2   guarantee that we'll prevail on the first either establishing a

3   sufficient breach rate that gets us up to a meaningful number.

4   So we really do need both.  Two critical claims of ours.

5           THE COURT:  Well I know they're critical and you

6   believe they're important, but I don't know when this case is

7   coming on for trial.

8           It's coming on for trial in 2013?

9           MR. FORLENZA:  Yes, sir.

10          THE COURT:  Why do I have to decide this before the

11  eve of trial?

12          MR. FORLENZA:  That's a good question.  Because we are

13  just about to wrap up fact discovery.  We're starting to get

14  involved with expert reports, and then we'll have depositions.

15  And what the -- the position they take is you cannot get any

16  relief under the material breach of contract claim without

17  showing causation; i.e., this breach affected and made this

18  loan default.

19          Now, if -- we're about to start taking borrower

20  depositions.  We've got documents.  Borrower depositions.  We

21  intend to simply be pretty straightforward.  Did you lie, you

22  know, what your income was, etc., etc.

23          If we have to go into, which is what they say our

24  burden is, all the circumstances, track down each borrower and

25  say all right what were the circumstances that led to your

C6D9SYNA

1    decision not to pay the mortgage but to pay the credit card

2    instead, that's the burden they want to place on us.  And the

3    reason that that's not appropriate in this case is under common

4    law, under New York insurance law, under equitable principles,

5    the whole purpose of rescission or rescissionary damages is to

6    put particularly an insurer back in the place it would have

7    been in had there not been an insurance policy.  And that's

8    based on, as I say, common law, 3106 of the insurance law.

9            The point, Judge, is that particularly with insurance

10   companies, warranties are conditions precedent.  And if you

11   look at 3106(a) of New York insurance law it points out that

12   they're conditions precedent to the taking effect of a contract

13   or a condition precedent to the liability.

14           Judge, I would submit that it's pretty clear that if

15   we prove that they have massively breached the loan level

16   warranties; if we prove, as alleged, that they have breached

17   the transactional level warranties; if we prove that they have

18   frustrated by buying back, what, I think one-and-a-half percent

19   of the 1300 loans.

20           THE COURT:  It's less than that.

21           MR. FORLENZA:  I think it is.

22           Clearly it's a material breach of contract.  That

23   entitles us or would entitle us to rescission.

24           And what a number of courts before January, not

25   including New York, and now with Justice Bransten including

1    New York, there's precedent saying look in a situation where an

2    insurer has issued a policy on a mortgage-backed security

3    transaction and did so on the basis of warranties that were

4    inaccurate, it would be ordinarily entitled to rescission.  But

5    where rescission is impractical or impossible, the Court has

6    the equitable power to be flexible and grant in its discretion

7    monetary relief that is the functional equivalent of

8    rescission; that is to say:  How do you put an insurer back in

9    the place it would have been in had it not issued the policy?

10            The case you mentioned -- I didn't remember it was

11   Justice Desmond, but I think it was the Glickman case in 19

12   whatever.

13            THE COURT:  43.

14            MR. FORLENZA:  Yes, sir.

15            Exactly that situation.  And even more to the point

16   there's a case called Levine which we discuss in our brief,

17   Judge, and that's right on the money in this sense, Judge.

18            THE COURT:  Is that the one with the light on the boat

19   and the lake?

20            MR. FORLENZA:  That's the boat and the search light

21   case, Judge?

22            THE COURT:  Yes.

23            MR. FORLENZA:  Exactly.

24            So the point that the Second Circuit made is, look,

25   the warranty was that this boat would have a search light.  The

C6D9SYNA

1    boat hits an obstruction that's underwater.  And the jury

2    concludes the search light would not have found or seen it.  So

3    there was no causal connection between the breach of warranty

4    and the loss.  There had to be a causal -- a connection between

5    the warranty and the general risk; i.e., hitting obstructions.

6    So it's perfectly clear that under Second Circuit authority and

7    New York law you don't have to show a causal connection with a

8    breach of warranty in an insurance contract.

9         Then I want to make one other point that I think is

10   critically important.  The Second Circuit in two decisions, one

11   back in 1937 which is Ginsberg and one in Mutual Benefit in

12   1988, we mentioned.  They talk about the strong public policy

13   in New York of not allowing insurance applicants to obtain

14   insurance with false or inaccurate warranties and then getting

15   any benefit under the policy, putting the insurer in a place --

16   position of having to pay anything.

17        And the Second Circuit in Mutual Benefit said that to

18   allow that would, quote, reward the practice of misrepresenting

19   facts critical to the underwriter's task, and the applicant

20   would have everything to gain and nothing to lose from making

21   material misrepresentations in his application for insurance.

22   Quote, New York does not permit this anomalous result.

23        Even more to the point.  In Ginsberg, back in 1937

24   right on causal connection.  The Second Circuit said:  If you

25   were to require insurers, when there's a breach of warranty --

C6D9SYNA

1   maybe that was a misrepresentation, but the same concept --

2   when they issue a policy based on facts that aren't true, if

3   you require them to show a causal connection, then what you're

4   doing is you're rewarding the applicant who has breached the

5   warranty.

6           And it uses this language.  Right on the money.  It

7   says, "The insured could freely misrepresent information

8   specifically requested and still recover on the policy if the

9   causal connection could not be traced."  It's right on the

10  money.

11          Now let me tell you what we're asking for, because

12  actually we were very conservative -- I was going to take you,

13  I don't have enough time to take you through Justice Bransten's

14  decision.

15          THE COURT:  I'll read Judge Bransten.

16          Is it on appeal?

17          MR. FORLENZA:  Yes, sir and I'm quite -- well, it is.

18          THE COURT:  It hasn't been argued then?

19          MR. FORLENZA:  October term, as I recall.

20          The point, Judge, is we have actually asked for a

21  rather conservative ruling from your Honor:  Simply, that this

22  Court, a federal district court, has the power, within its

23  discretion, under these circumstances if we prove our case,

24  prove that legal damages are inadequate, we prove all that,

25  this Court simply has the power to grant that relief.  You can

C6D9SYNA

1    do it on a full record.  We're not asking for a ruling.

2            Justice Bransten actually went further and said if

3    Syncora and MBIA prove their case against Countrywide, they are

4    entitled to rescissionary damages.  We've asked for something

5    more conservative.  Maybe if that decision would have come done

6    before we drafted our declaration I wouldn't have been so

7    conservative.  But it's a very conservative request.

8            And the reason we want this part of the case, Judge,

9    it really will affect the way we're going to have to prepare

10   this case and try this case if, in fact, your Honor ruled,

11   which I would find surprising, that you actually do not have

12   the power as a court of equity to grant the relief that you

13   think is appropriate.

14           THE COURT:  Thank you.

15           Mr. Sacks.

16           MR. FORLENZA:  Thank you very much.

17           MR. SACKS:  Thank you, your Honor.

18           Your question is why do you have to decide this now.

19           THE COURT:  Yes.

20           MR. SACKS:  You don't have to decide this now.  Not

21   only do you not have to decide it now, you shouldn't decide it

22   now.  They're asking you hypothetical questions about a Court's

23   hypothetical equity power.  An equity power is discretionary

24   within the Court in terms of all of the facts and

25   circumstances --

C6D9SYNA

1              THE COURT:  Well don't I have that power?

2              MR. SACKS:  Of course you have that power.  You have

3       the power as a court of equity to do equity within the bounds

4       of your discretion.  You shouldn't be issuing any rulings about

5       what if this then that maybe this.  You don't have any

6       evidence.

7              Equity is power that you exercise in light of the

8       evidence that's presented to you and in light of a variety of

9       different principles when damages, legal damages are inadequate

10      as a matter of law.  They haven't even met the first test.

11      Because they're asserting damage claims in this case.

12             So, you may conclude damages are -- well, first of

13      all, you may conclude they're entitled to nothing because,

14      again, you understand we fundamentally dispute this notion of

15      all these breaches.  They presented zero evidence of it.  So

16      you may decide --

17             THE COURT:  Your theory is that, I guess it's on the

18      front page, the collapse of the U.S. housing market.  That's

19      what caused Syncora's difficulty.

20             MR. SACKS:  Absolutely.

21             THE COURT:  It wasn't breaches of representations of

22      warranties that caused the difficulty that Syncora is

23      experiencing.

24             MR. SACKS:  Absolutely.  It was the risk they agreed

25      to insure.  Specifically no one in their right mind -- no one

C6D9SYNA

1    at that point in time thought that the housing market was going

2    to collapse 35 percent right after they insured this

3    transaction.  And nobody thought that the California housing

4    market was going to collapse 45 percent.  And 55 percent of

5    these loans were in California.

6            There is no question, in our mind at least, and that's

7    what the trial will be about, as to what caused the losses in

8    this.  They had nothing to do with these breaches that they are

9    claiming.

10           THE COURT:  Mr. Sacks, I asked you the first time you

11   were up about the -- those cases by Judge Desmond and Judge

12   Hand and you said I was getting ahead of myself.

13           MR. SACKS:  Correct.

14           THE COURT:  So.

15           MR. SACKS:  Can I address those?

16           THE COURT:  Yes, please.

17           MR. SACKS:  But can I address them also, your Honor,

18   in the context of those are -- first of all, they rely on these

19   several three -- two or three very old cases.  Those are

20   cases --

21           THE COURT:  Old law is good law.

22           MR. SACKS:  Maybe or maybe not.  Maybe or maybe not

23   because there's more recent law that suggests a different

24   outcome.

25           But, your Honor, those are rescission cases in the

C6D9SYNA

1    first instance.  I want to take this in two steps, first of

2    all.

3              THE COURT:  I thought you were going to tell me there

4    are also cases that were after trial.

5              MR. SACKS:  No.  That's not going to be the basis --

6    could be another distinction.  That's not the fundamental one

7    I'm going to give to your Honor.  Those are rescission cases,

8    your Honor.

9              While you have broad equitable powers, I believe you

10   do not have the power in this case to grant them rescission

11   because they have contractually agreed that they may not have

12   rescission in this case.  And if they've agreed they can't have

13   rescission, you can't award them the equivalent as

14   rescissionary damages.

15             If you look at the charts, your Honor, it's a case

16   that they cited in another context.  The last page of this,

17   rescission was found to be -- basically describes that

18   rescissionary damages are the economic equivalent of rescission

19   in circumstances where rescission is impractical.

20             This is not a case where rescission is impractical.

21             THE COURT:  It's impossible.  It's not legally viable.

22             MR. SACKS:  They've waived their right to it.

23             THE COURT:  But what about the cases that they cite?

24   An insurer goes in he says -- doesn't disclose the ulcer

25   problem.  They find out about it.  And he dies of a coronary

C6D9SYNA

1   disease.  And the Court says, New York Court of Appeals, Judge

2   Desmond, who is a very young man, says doesn't make any

3   difference.  It affects the risk profile.  And Judge Hand says

4   the same thing.

5        MR. SACKS:  Your Honor, the more recent cases say that

6   the reason that -- we cite you to -- let me find the cases.  I

7   apologize.  It's Anjay, I believe is one, and the other is --

8   apologies.

9        THE COURT:  Anjay Corporation.

10        MR. SACKS:  Anjay and Nunez are the two that we cite,

11   are more recent appellate division cases, which in looking at

12   this, looked at whether the reason for the loss is causally

13   connected to the breach of a warranty.

14        They argue these fit within 3106(b)'s exception for

15   multi-peril insurance.

16        First of all, your Honor, I do want to take a minute

17   and explain why 3106(b) doesn't apply here, I think it's

18   important.

19        But it is no more multi-peril than this particular

20   case is.  In those cases, it was property damage.  And they

21   concluded in Anjay that a breach of warranty relating to video

22   surveillance didn't give him a basis to rescind when the damage

23   to the property occurred because of an explosion.

24        And in Nunez it was a breach of warranty relating to

25   the existence of fire extinguishers didn't provide a basis to

C6D9SYNA

1    rescind where the property damage to the apartment occurred as

2    a result of water from a fire upstairs.  There was no nexus

3    between the two.

4            These are more recent cases, an '06 and a 2011

5    appellate division case.  And what they illustrate is that the

6    harsh rule that you're looking at in those other cases is not

7    the rule, number one.

8            Number two, that is a rule that would justify

9    rescission which they can't get in this case.

10           Number three, those are cases where they were using it

11   as a defense to payment on the policy.  Here, this is not --

12   nobody is seeking to avoid payment on the policy.

13           THE COURT:  This is your sword/shield distinction.

14           MR. SACKS:  Correct, in part, your Honor.

15           But in this particular case, your Honor, if you look

16   at it, you have to look at the -- let me -- we do not contest

17   that you have broad equitable powers subject to the

18   limitations -- and I think we should argue the limitation at

19   trial when you hear all the evidence about the contract and

20   what they did and didn't agree to.  We will argue that your

21   powers have to stop short of rescission because they agree that

22   they could not seek rescission.

23           They also can't get rescission because they haven't

24   named any of the other parties to the contract.  3106 doesn't

25   apply because I think the contract they're seeking rescission

C6D9SYNA

| | |
|---|---|
| 1 | of isn't an insurance contract.  The I&I agreement isn't an |
| 2 | insurance contract.  The policy is an insurance contract.  My |
| 3 | client is not a party to the policy.  They're not seeking |
| 4 | rescission or rescissory damages on that.  They don't have the |
| 5 | parties to the policy here.  They don't have the other parties |
| 6 | to the I&I agreement here. |
| 7 | THE COURT:  Tell me then, Mr. Sacks, assuming that |
| 8 | Syncora is right and that the representations and the |
| 9 | warranties are false, what is the remedy? |
| 10 | MR. SACKS:  The remedy is that any of the |
| 11 | representations and warranties -- |
| 12 | THE COURT:  That result in a loss. |
| 13 | MR. SACKS:  That resulted in a default of a loan or |
| 14 | other loss. |
| 15 | THE COURT:  Of a particular mortgage. |
| 16 | MR. SACKS:  Well it's a particular mortgage.  But I'm |
| 17 | not telling your Honor that they necessarily have to try the |
| 18 | case mortgage by mortgage. |
| 19 | Your Honor is very clear about that.  There may be |
| 20 | ways to extrapolate.  There may be ways to sample.  We haven't |
| 21 | yet had evidence and discussion about what samples may or may |
| 22 | not be appropriate; what they can -- I'm not saying they can do |
| 23 | it.  I am not saying that they are necessarily precluded. |
| 24 | That's something that we're going to have to discuss with your |
| 25 | Honor at some point in time. |

C6D9SYNA

1         They could arguably do it by having people look at the

2    mortgages they've claimed on.  Remember, they've claimed on

3    1600 mortgages or something like that.  Remember, the testimony

4    I just cited to your Honor said the -- they understood that

5    seven hundred might be subject to problems.  So, how many of

6    them are or are not defective?

7         People understood that this was a process that was

8    going to involve looking at the circumstances of individual

9    mortgages because the reps and warranties they contend were

10   breached go to the circumstances of individual mortgages.  In

11   loan number 106, they repped and warranted that the buyer --

12   the borrower didn't commit fraud.  The borrower committed

13   fraud.  That goes to that loan.  You can't look at loan 108 to

14   determine what the borrower under 106 did.  That's the nature

15   of this transaction.  It's the nature of the reps and

16   warranties.  But that doesn't mean your Honor at a trial needs

17   to sit through all of that.  There are many ways to do that

18   through experts and summarization and things of that sort so

19   that your Honor is never going to have to sit through and

20   listen to all of that in this particular case.  So I wouldn't

21   worry about that.

22        But your Honor, in answer to your question, if they

23   show that there was a breach of a rep and warranty that had --

24   that caused them to suffer any damage, they get to recover for

25   it in this case.  If we fail to meet our repurchase obligation,

C6D9SYNA

1   they can recover in monetary damages from us for it.  They can

2   prove that.  They've got claims for it.  And we don't believe

3   that there's going to be any basis for equitable relief in this

4   case.

5           They're not going to show that we had more knowledge

6   of these loans than they did.  They had the same knowledge

7   about these loans as we did.  It's a risk allocation issue in

8   this contract.

9           They're not going to show, notwithstanding their

10  puffery in these briefs, they have utterly no evidence of it,

11  that we committed fraud.

12          And remember, your Honor, you refused to allow them to

13  assert a fraud claim in this case.  So we're sitting here

14  seeking remedies that are effectively fraud-based remedies in a

15  case where your Honor has ruled they can't bring a fraud claim.

16          They brought that claim across the street in state

17  court.  You've said that they couldn't amend to bring a fraud

18  claim here.  We're looking at fraud-based remedies.  You look

19  at Glickman --

20          THE COURT:  Is that what Judge Bransten ruled on?

21          MR. SACKS:  No, not in our case.  No, no, no.  Not in

22  our case.  We have Justice Ramos in our case, your Honor.  So

23  he hasn't ruled on any of these issues at this point in time.

24          But they've brought a fraud claim across the street.

25  They shouldn't be looking at this in this particular case to

C6D9SYNA

1   essentially assert the same remedy.

2           Let me spend one minute on 3106, if I could.

3           THE COURT:  Yes, please.

4           MR. SACKS:  Which is an insurance clause.

5           It applies to warranties in an insurance contract

6   only.

7           First of all, it's a consumer protection statute that

8   limits the ability of an insurer to rescind.  Again, it's a

9   rescission issue.  It only speaks to rescission, which they

10  waived.  But even if you want to overlook that, it is a statute

11  that limits the insurers right to rescind.  It doesn't give it

12  affirmative rights beyond the law.

13          And an insurer, like everybody else, is subject to the

14  normal rules of equity jurisprudence.  You want equitable

15  relief, you have to have no adequate remedy at law.  And in

16  these older cases, indeed, you look at it and you get

17  rescission.  Well, of course, there is no remedy at law other

18  than rescission because they didn't want to pay on an insurance

19  contract.  It makes perfect sense.

20          Here, they have a remedy at law.  The contract

21  provides them with effective, carefully negotiated remedies at

22  law.  So, that's number two.  They still have to meet that.

23          Number three, it applies only to rescission of an

24  insurance contract and the warranty has to be in the insurance

25  contract.

C6D9SYNA

1              They keep talking about rescission and rescissory

2      damages.  I don't know what contract they think they're getting

3      rescissory damages on or rescission on.  But there is no

4      warranty in the insurance agreement contract here.  That is the

5      policy.  It has no warranties.

6              If you look at the attachments here, your Honor, it

7      expressly says there are no warranties.  It is nonrescindable.

8      No restrictions or conditions --

9              THE COURT:  Mr. Sacks, are you saying I should look at

10     the attachment?

11             MR. SACKS:  I'm sorry.  In the demonstratives I handed

12     up to your Honor, if you look at the next to the last page,

13     fourth page, it cites several excerpts from the insurance

14     policy, which precludes cancellation, revocation, or

15     rescission.  There are no conditions --

16             THE COURT:  This is the insurance policy issued to

17     the -- by the insurer to the noteholders?

18             MR. SACKS:  Correct.

19             THE COURT:  Okay.

20             MR. SACKS:  And that's what they want to -- all the

21     damages they're asking for in the form of rescissionary damages

22     are amounts they paid under this policy.

23             They didn't pay us any money.  No money was paid to my

24     client.  It's all money they paid under this policy that they

25     agreed they wouldn't rescind.

C6D9SYNA

1          So are they seeking rescissionary damages under that

2    policy?  That's the insurance contract.  But that contract has

3    no warranties in it.

4          3106 only applies to warranties in an insurance

5    contract.  The warranties here that they are referencing are

6    different contracts.  It's the I&I agreement.

7          The I&I agreement is not an insurance contract.  It

8    doesn't convey insurance to anybody.

9          There are two different agreements.

10          Now, I don't know what they're -- they're trying to

11    fit a square peg in a round hole.  They're trying to cite to

12    your Honor law that they like but under the guise -- listen,

13    you will hear the evidence at trial.  If you believe, subject

14    to the limitations of their agreement that they can't get

15    rescission, that the facts justify equitable relief because

16    monetary damages are not appropriate, that's what you'll

17    determine, based on the evidence that's presented.

18          But the notion that you can determine in the abstract

19    with no evidence -- there is no evidence on this motion that

20    equitable relief might, could, or how you would decide to

21    exercise equitable discretion which this Court has, based upon

22    hypothetical facts that may or may not be shown, but only one

23    side of the hypothetical facts, without consideration of the

24    other facts that bear upon all of the facts and circumstances

25    and bear upon the equities, that's not something that can be

C6D9SYNA

determined in an abstract hypothetical ruling in a vacuum, so

to speak.

        The Court only exercises its equitable discretion in

light of the facts, all of the facts that are presented to it.

They want to present you with a couple of facts on this motion.

        And they're not even presenting you with facts.

They're presenting you:  If we show this.  Not that we've shown

it.  But if we show these two things, then you have the power

to give us this.

        Well, what if we show all these other things?  What if

we show that none of these loans have to do with it?  What if

we show that none of these were material breaches?  What if we

show that there were only 40 material breaches, way less than

the seven hundred they said?  What if we show they had as much

knowledge as we did?  What if we show that we were as harmed as

they were?  What if we show that we went out of business

because of transactions like this one, that nobody did anything

wrong?  Those are all equitable facts and circumstances.  And

they can't get a hypothetical ruling on a motion like this as

to how a court will or will not exercise its equitable power.

        The only point I will make is that to the extent they

are actually seeking rescission or its equivalent,

rescissionary damages, you can rule that they cannot get that

particular form of relief because contractually they agreed

that they would not seek that form of relief.

C6D9SYNA

```
1                THE COURT:  Thank you.

2                MR. SACKS:  That's a legal issue.  Beyond that, within

3    the scope of your equitable powers, that's for trial, your

4    Honor.

5                THE COURT:  Thank you, Mr. Sacks.

6                Mr. Forlenza.

7                MR. FORLENZA:  Yes, very briefly.

8                THE COURT:  Very briefly.

9                MR. FORLENZA:  On the last point, it is absurd to

10   suggest that we agreed we wouldn't seek rescissionary damages

11   from the applicant.  The irrevocable policy was for the benefit

12   of the noteholders.

13               THE COURT:  Wait a minute.

14               I understand Mr. Sacks as saying that 3106 applies to

15   insurance contracts.

16               MR. FORLENZA:  Yes, and the --

17               THE COURT:  I&I is not an insurance contract.

18               MR. FORLENZA:  I think it is, Judge under -- when you

19   read the provisions of 3106.

20               THE COURT:  Who are the parties to the I&I?

21               MR. FORLENZA:  It is the --

22               THE COURT:  You and?

23               MR. FORLENZA:  Syncora.

24               THE COURT:  And EMC.

25               MR. FORLENZA:  The sponsor.  EMC.  Yes, your Honor.
```

C6D9SYNA

1          The point is the I&I and the insurance policy are

2     integral.  They are a related, integrated contract.  That is to

3     say, under the I&I we are required to issue the insurance

4     policy.  We got all the reps and warranties for one purpose.

5     The one thing that we do is we issue the insurance policy.  Of

6     course you've got to look at both of them as related, I submit,

7     as a related contract, which is an insurance contract.

8          THE COURT:  Okay.  Go ahead.

9          MR. FORLENZA:  Secondly, we are not seeking fraud

10    relief.  Mr. Sacks is not addressing that the remedy for breach

11    of warranty, a material breach of contract, is either

12    rescission or rescissionary damages.  That's a breach of

13    contract remedy.

14         Now, Mr. Sacks says that 3106 is a shield, not a

15    sword.  And he keeps saying it only relates to rescission.

16         Actually, it says that you may, on a breach of

17    warranty, an insurer may void the contract, rescission, or

18    defeat recovery, or defeat liability.  And that doesn't mean

19    just a defense to a claim.  Under the Kirton case, it includes

20    getting a money damage award for claims already paid.  The

21    Kirton case.

22         But let me make this very clear.  We do not seek

23    rescissionary damages under the authority of 3106.  We say, as

24    Justice Bransten found, that the Court, sitting in equity, is

25    informed by 3106 because 3106 makes it very clear that the New

C6D9SYNA

1  York state policy in insurance cases, is that if you have a

2  breach of warranty that materially increases the risk of the

3  loss, the remedy is to keep the insurer free of any liability

4  whether through rescission, avoidance, or recoupment.  That's

5  just the policy.

6         That raises the question when your Honor is deciding

7  whether it's appropriate to give rescissionary damages, you

8  take it into consideration.  But it's your equitable power that

9  gives us the ability to ask for that relief.

10        I think that's it, Judge.

11        THE COURT:  Wait a minute.  You have a further

12  communication.

13        MR. FORLENZA:  Forgive me.  My partner points out if

14  you look at section 3.01 of the I&I agreement, that's where it

15  makes it clear that it's a predicate and the whole purpose of

16  this I&I from the insurance perspective -- the insurer's

17  perspective to issue the policy.

18        And frankly, Judge, to try to tease away the I&I

19  agreement which says you, the insurer, have one thing to do,

20  issue a policy, take on the risk of $600 million, and do so

21  based on 71 warranties, and then say --

22        THE COURT:  So the point you're making is the insurer

23  agrees to issue the policy subject to satisfaction of the

24  conditions precedent which are the reps and warranties.

25        MR. FORLENZA:  Precisely.

C6D9SYNA

1              THE COURT:  Set forth below on or prior to the closing

2       date.

3              MR. FORLENZA:  Precisely.

4              You can't tease these two agreements apart.  That's

5       the whole point of the insurance and the insurers role in this.

6              So to suggest that they could breach all of the

7       warranties with 85 percent of the collateral that is the sole

8       source of the funds for the insurance company's $600 million

9       exposure and to say, well, they really don't have anything to

10      do with each other.

11             Thank you, Judge.

12             THE COURT:  Thank you very much, Mr. Forlenza.

13             I'll get to this promptly.  Thank you.

14             (Adjourned)

15

16

17

18

19

20

21

22

23

24

25